THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| RAVENEAUX LTD., | § | Case No. 05-32734-H5-11 |
| | § | (Chapter 11) |
| Debtor. | § | |

[PROPOSED]
DISCLOSURE STATEMENT UNDER 11 U.S.C. §1125
IN SUPPORT OF CHAPTER 11 PLAN OF REORGANIZATION
SUBMITTED BY RAVENEAUX LIMITED, DEBTOR-IN-POSSESSION

IMPORTANT

NOTICE TO CREDITORS AND PARTIES IN INTEREST

THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS AND INTEREST HOLDERS OF THE DEBTOR ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THIS PLAN UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE PLAN OF REORGANIZATION. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

**THE DEBTOR RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT, NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN.   ANY REPRESENTATIONS OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.**

**ON _____, 2005, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.   SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION, HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AGAINST AND INTERESTS IN THE DEBTOR ARE IMPAIRED UNDER THE PLAN OF REORGANIZATION.   CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE NOT LATER THAN 4:00 P.M. ON _____, 2005 TO:**

Weycer, Kaplan, Pulaski & Zuber, P.C.
Hugh M. Ray, III
11 Greenway Plaza, Suite 1400
Houston, TX. 77046

**DISCLOSURE STATEMENT UNDER 11 U.S.C. §1125**
**IN SUPPORT OF CHAPTER 11 PLAN OF REORGANIZATION**
**RAVENEAUX LIMITED D/B/A RAVENEAUX COUNTRY CLUB, DEBTOR**

Raveneaux Country Club a/k/a Raveneaux Limited ("Raveneaux" or "Debtor"), debtor-in-possession submits this Disclosure Statement under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) to its known Creditors and Interest Holders.   The Debtor has promulgated the Plan consistent with the provisions of the Bankruptcy Code.  The purpose of the Plan is to provide the maximum recovery to each Class of Claims and Interests considering the assets and anticipated funds available for distribution.  Raveneaux believes that the Plan permits the maximum recovery for all allowed Classes of Claims and Interest, and contains less risk than other possible Plans which may be filed.

Article 1
**Introduction**

**1.1    General Information Concerning Disclosure Statement and Plan**

On June 24, 2005, the Debtor filed its "Plan of Reorganization" with the United States Bankruptcy Court for the Southern District of Texas.  In this Disclosure Statement, the "Plan of Reorganization" is referred to as "the Plan" and the United States Bankruptcy Court for the Southern District of Texas is referred to as "the Bankruptcy Court."  The Debtor submits this Disclosure Statement under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 to all of its known Creditors and parties in interest as required by the Bankruptcy Rules.[1]

The purpose of this Disclosure Statement is to provide "adequate information" to enable creditors and equity interest holders whose claims or interests are impaired under the Plan to arrive at a reasonably informed decision in exercising their rights to accept or reject the Plan.  A copy of the Plan is attached as Exhibit "A."  Creditors and Equity Interest Holders are urged to consult with their own individual counsel or each other and to review all of the pleadings filed in this bankruptcy proceeding in order to fully understand the disclosures made herein, the Plan filed herein and any other pertinent matters in this proceeding.  Capitalized terms used but not defined in this Disclosure Statement will have the meanings assigned to them in Article I of the Plan or in Title XI of the United States Code and Federal Rules of Bankruptcy Procedure.  All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Interests under the Plan.  It is submitted as an

---

[1] The Debtor was aware of potential claims by former members for refunds of their membership deposits.  The Court established a bar date to file those claims and the potential claimants were mailed notice of the bankruptcy and the bar date to their last known address.  Those former members who failed to file proofs of claim by the bar date have no claims and, accordingly, are not being served with this Disclosure Statement.

aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to explain fully various aspects of the Plan as they affect Creditors and Interest Holders.

### 1.2    Disclaimers

**UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.**

**WHILE THE INFORMATION PROVIDED HEREIN IS BELIEVED RELIABLE, UNLESS OTHERWISE STATED, THE DEBTOR HAS NOT UNDERTAKEN TO VERIFY OR INVESTIGATE SUCH INFORMATION. NEITHER THE DEBTOR NOR ITS COUNSEL MAKES ANY WARRANTY OR REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**

**DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTOR THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE RESTRUCTURING OF THE DEBTOR'S OBLIGATIONS OR THAT THE REORGANIZED RAVENEAUX'S OBLIGATIONS WILL BE FULLY PERFORMED IN THE FUTURE WITHOUT RISK OF FURTHER DEFAULT.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THE SECURITIES AND EXCHANGE COMMISSION HAS NEITHER APPROVED NOR DISAPPROVED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE COMMISSION HAS ALSO NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT AND THE ATTACHED PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

Article 2
**Answers to Commonly Asked Questions**

The Debtor has submitted this Plan in an effort to satisfy its obligations.   The Debtor submits the following commonly asked questions and answers.

**2.1    Who is the Debtor?**

The Debtor operates a 36 hole golf course and country club.   It has 12 tennis courts, a Junior-Olympic size swimming pool, professional instruction, and over 40,000 square feet of clubhouse space, including numerous banquet and dining rooms.   It has over 1200 members and is well-known as an established, if older, country club.   Since its establishment in 1978, the city of Houston has grown up around the club.   High-end houses surround the club.

The Debtor owns approximately 279 acres of land that is not deed-restricted or zoned. However, several acres are in the flood plain and cannot be built on without flood planning and prevention.   The Debtor has engaged in significant discussions with inventors who have proposed alternative financing and restructuring options.   As of the date of this Disclosure Statement, the Debtor has not obtained a binding letter of intent for that refinancing or restructuring.   Accordingly, the Plan, proposes an internal restructure of debts under the Bankruptcy Code.   If a more favorable restructuring plan is consummated before the Effective Date, the Debtor may propose a different Plan.

**2.2    What is a Chapter 11 bankruptcy?**

Chapter 11 of the Bankruptcy Code is a remedial statute designed to effect the rehabilitation and reorganization of financially distressed individuals and entities.   The statutory aims of reorganization proceedings include the following:

(a)  Preservation of the Debtor's property as a "going concern" and the preservation of any going concern value of the Debtor's business and property;

(b)  avoidance of the forced and destructive liquidation of the Debtor's assets;

(c)  the protection of the interest of the creditors, both secured and unsecured;

(d)  the restructuring of the debts of the Debtor and its finances to enable it to retain those assets necessary to rehabilitate its finances and produce the greatest recovery for its creditors.

While the formulation and confirmation of a Plan of Reorganization is the principal function of a Chapter 11 case, Congress recognized in 11 U.S.C. Section 1123(a)(5)(d), that the sale of all or any part of the property of the estate and the distribution of all or part of the property of the estate among those having an interest in the property is also a legitimate function of a Chapter 11 proceeding.   Therefore, a Plan may affect the interest of all parties and creditors, reject executory contracts and provide for prosecution and/or settlement of claims against third parties.   For a Plan

to be confirmed by the Court, the Code requires that the Court find that the Plan has received the favorable votes of certain requisite classes and that the Plan be "fair, equitable and feasible," as to any dissenting classes of creditors. A more detailed description of the voting requirements of a Plan is set forth later in this Disclosure Statement. The foregoing is a brief summary of the requirements for a Plan and should not be relied upon for voting purposes. Creditors are urged to consult their own counsel before making any decisions on a Plan filed herein.

This Chapter 11 proceeding is conducted under the supervision of a Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Pursuant to the Code, the Court may:

      (a) Authorize the Debtor to operate its business and manage its property;

      (b) permit rejection of executory contracts;

      (c) grant or deny relief from any litigation filed;

      (d) approve and confirm any Plans of Reorganization.

      (e) Recover money paid that was transferred fraudulently or to prefer one creditor over others.

### 2.3     Why did the Debtor file a Plan?

The Debtor filed its plan because it wanted to pay the most amount of money to creditors it could in a commercially reasonable way while maintaining the membership and operation of the business. The Plan allows for the Debtor to recapitalize, re-invest and re-invent itself. On June 24, 2005, the Debtor filed its plan of reorganization (attached). The Plan proposes to pay the main secured debt on real estate in full over a period of 24 months and provide adequate protection by continuing the real estate liens. Priority tax claims will be paid in full over six years as permitted by the Bankruptcy Code. Claims secured by equipment will be paid in full according to the terms of the original agreements. The Plan will also arrange for a payment of existing unsecured debts in full from Available Cash Flow, proceeds of refinancing or sale. Exit Financing will be provided by a priority loan over the existing real estate notes. If the Debtor has not refinanced the real estate debt one year after the Effective Date, the property will be listed for sale to pay debts and sold within one year thereafter and the proceeds used to pay Claims as set forth herein. The property must be refinanced or sold within 24 months of the Effective Date, otherwise the real estate lenders will be permitted to foreclose. At any time before the Property is sold, the Debtor may obtain refinancing or re-investment funds sufficient to satisfy the main debt secured by the real estate, in which case the Debtor need not sell the Property

### 2.4     If the Plan governs how I will be paid, what is this Disclosure Statement?

The Bankruptcy Code requires that all creditors or shareholders whose claims or interests the Plan impairs be given an opportunity to vote to accept or reject the Plan. Before the Debtor can solicit your vote on the Plan, it must first give you a written disclosure statement that the

Bankruptcy Court has approved. The purpose of the disclosure statement is to provide all creditors and shareholders with enough information so that they can make an informed decision about the Plan. The Disclosure Statement and the Plan are formally distributed after the Bankruptcy Court approves the Disclosure Statement. At that time, creditors and equity interests holders also receive a voting ballot with the Disclosure Statement and Plan.

### 2.5    Has this Disclosure Statement been approved by the Bankruptcy Court?

Yes. On _____, 2005, the Bankruptcy Court approved this Disclosure Statement as containing adequate information. "Adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant classes to make an informed judgment as to whether to vote to accept or reject the plan.

### 2.6    How do I determine how my Claim or Interest is classified?

To determine how your claim is classified under the Plan, the nature of that claim or interest must first be determined. Under the Plan, claims and interests are classified into a series of Classes. The pertinent sections of the Disclosure Statement and Plan disclose, among other things, the members of each particular Class, the size of each Class, what you will receive for your Claim or Interest if the Plan is confirmed, and when you will receive such consideration if the Plan is confirmed. Most creditors are classified as General Unsecured Creditors. Failure to have filed a claim by the Bar Date may result in a disallowance of your claim. Persons wishing to file Claims after the Bar Date will be required to meet strict legal standards for the late filing of a Claim.

### 2.7    Why is confirmation of the Plan important?

The Bankruptcy Court's confirmation of the Plan is necessary for the Debtor to carry out the treatment of creditors and equity owners under the Plan. Unless the Plan is confirmed, the Debtor is legally prohibited from satisfying Claims or Interests as provided in the Plan.

### 2.8    Who is entitled to vote on the Plan?

Creditors and Equity Interest Holders whose Claims or Interests are impaired are entitled to vote on the Plan. Classes 1A, 1B, 3, 5B, 7, and 8 may vote. This Disclosure Statement describes the classes of Claims that are impaired. Please review it carefully. Secured Claims against the real estate (Class 1) are impaired and are entitled to vote. Insider Secured and Unsecured Claims (Class 3) have their Claims impaired and are entitled to vote. Membership Deposit Refund Claims for those who are no longer members (Class 5B) are impaired and are entitled to vote. General Unsecured Creditors (Class 7) have their claims impaired and are entitled to vote. Interest Holders (Class 8) have their partnership rights impaired and are entitled to vote on the Plan. If you hold an impaired Claim or Interest and did not receive a voting ballot, please contact Ed Rothberg at 713-961-9045.

### 2.9    What Is Necessary to Confirm the Plan?

Confirmation of the Plan requires, among other things that at least one class of impaired claims vote to accept the Plan. Acceptance by a class of claims means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed claims actually voting in the class vote in favor of the Plan. Because only those claims who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims. Besides acceptance of the plan by each class of impaired creditors, a bankruptcy court also must find that a plan meets a number of statutory tests before it may confirm the plan. These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests who do not vote to accept a plan but who will nonetheless be bound by a plan's provisions if a bankruptcy court confirms a plan. If one or more classes vote to reject a plan, the Debtor may still request that the Bankruptcy Court confirm a plan under § 1129(b). To confirm a plan not accepted by all classes, the Debtor must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown."

### 2.10    Is there a Creditors' Committee?

Yes. The members of the Official Unsecured Creditor's Committee (the "Committee") are: Nu West Golf Course Construction, Champions Printing & Publishing, Inc., Michael Watford, C.W. Stubbs, and Metzger Construction Company. The interests of the unsecured creditors are represented by the Committee. Counsel for the Committee is Trent Rosenthal at Boyar and Miller, 4265 San Felipe, Suite 1200, Houston, Texas 77027 (713) 850-7766. Mr. Rosenthal does not represent any individual creditors in this case and only represents the Committee. Mr. Rosenthal may be contacted to discuss general information about the case and the interests of unsecured creditors, to the extent the Committee permits. The Committee was only recently provided with a copy of the Plan. As of June ___, 2005, the Committee has not approved the Plan or this Disclosure Statement, and is not in a position to make any recommendation regarding same at this time. The Committee will continue to evaluate the issues, and hopes to be in a position to make a recommendation with respect to the Plan.

### 2.11    What is the Reorganized Debtor that is referenced in the Plan?

If the Plan is confirmed, Raveneaux will emerge from bankruptcy and will operate its assets, conduct any litigation, and make distributions to its creditors. The company that will emerge from bankruptcy is referred to in this Disclosure Statement (and the Plan) as the Reorganized Debtor. If the refinancing is eventually unsuccessful, then the Reorganized Debtor will sell the Property and use the proceeds to pay the creditors in the order of priority required by the Bankruptcy Code.

### 2.12    When Is the Deadline for Returning My Ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, ballots must be received by counsel to the Debtor by 4:30 p.m. Central Time, on _____, 2005 at the following address:

Weycer, Kaplan, Pulaski & Zuber, P.C.
Hugh M. Ray, III
11 Greenway Plaza, Suite 1400
Houston, TX. 77046

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE ON THE PLAN. THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS. FOR THIS REASON, THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

Article 3
**Overview of the Plan**

**3.1    Introduction.**    An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan, a copy of which is attached as Exhibit "A" to this Disclosure Statement. If the Court confirms the Plan, and in the absence of any applicable stay, and all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

**3.2    Class 1A – Secured claims on Real Estate  - Steamboat Capital II, L.L.C. and the Small Business Administration.**    The Allowed Secured Claims of Steamboat Capital II, L.L.C. (first lien) and the Small Business Administration (second lien) shall continue to be secured by the Debtor's assets under the original loan documents (but subject to the Exit Financing). The terms of both loans shall be extended for a period of 2 years from the Effective Date. Interest will be calculated as set forth under the loan documents. No prepayment penalties shall be chargeable on either loan. The Class 1 claims shall receive monthly payments of principal and interest based on a 25 year amortization of the Allowed amount of the Claim. In addition, the Reorganized Debtor shall continue to make monthly tax escrow payments to the first lienholder as called for under the original loan documents. The Class 1 Claims are impaired.

**3.3    Class 1B – Other Secured Claims.**    The other Holders of other Allowed Secured Claims of the Debtor which are not in Class 1 or Class 3 shall be paid pursuant to the terms of their existing loan documents and the existing maturities shall be reinstated. Any defaults shall be cured by agreement of the parties or pursuant to Court order. This class contains the purchase money security interest claims of vendors on equipment. The Class 1B Claims are not impaired.

**3.4    Class 2 – Priority Non-Tax Claims.**    Allowed Priority Non-Tax Claims will be satisfied by the payment of Cash on the Effective Date, or the date on which such Claim becomes an Allowed Claim, in the Amount of the Allowed Claim as set forth in Section 3.6 of the Plan. The Class 2 Claims are not impaired.

**3.5     Class 3 – Subordinated Secured and Unsecured Claims.** The Allowed Secured Claims and Allowed Unsecured Claims of certain Insiders and former partners will be subordinated below the claims of General Unsecured Creditors and, in satisfaction of their claims, will receive either (i) cash in the Allowed amount of their Claims after payment in full in accordance with this Plan of the Claims in Classes, 1, 2, 4 and 7 or be issued Limited Partnership Units as determined by the General Partner. This Class includes Janet Britain, Kate Mower, Dennis Evans, Mike Watford, and Jerry Sides. The Class 3 Claims are impaired.

**3.6     Class 4 – Priority Tax Claims.** Priority Tax Claims are Claims asserted by governmental units entitled to priority under Bankruptcy Code § 507(a)(8). The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such claims receive the treatment described below unless the holder of such Claim consents to different treatment.

       **3.6.1**     Any holder of an Allowed Priority Tax Claim shall receive at the Debtor's option (i) the amount of the Allowed Priority Tax Claim in one cash payment on or immediately after the Effective Date or (ii) the amount of the Allowed Priority Tax Claim, with interest at 3% simple interest per annum or such other rate to be determined by the Court at the hearing on Confirmation of the Plan, in equal annual Cash Payments on each anniversary of the Effective Date, until the last anniversary of the Effective Date that precedes the sixth anniversary date of the date of assessment of the Allowed Priority Tax Claim.

       **3.6.2**     A Priority Tax Claim that is a Contested Claim shall not receive any distribution on the Effective Date or thereafter unless and until such Claim becomes an Allowed Priority Tax Claim. Allowed Secured Claims for taxes will be satisfied first as non-classified Priority Tax Claims to the extent they qualify as Priority Tax Claims, but shall retain any collateral for such Claim until the Priority Tax Claim is paid in full. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, but is a valid Allowed Secured Claim, it will be classified as a Secured Tax Claim.

**3.7 Class 5A – General Unsecured Claims of Membership Deposit Refunds with respect to existing members for return of their deposits after the expiration of 30 years.** Between approximately 1978 and 1987, the Debtor sold memberships under a membership agreement that accepted a Membership Deposit. The obligation to refund Membership Deposits has not yet come due. The first of these Membership Deposit Refunds is scheduled to be paid in 2009. The Debtor utilized its best efforts to establish who was owed these refunds and sent notice of the bankruptcy to the last known address for each of those members. The Debtor established a bar date for Membership Deposit Refund Claimants, serving 747 potential claimants on May 16, 2005 and requiring that their proofs of claim be on file with the Clerk by June 15, 2005 and by serving the remaining 810 potential claimants on June 2, 2005 and requiring that their proofs of claim be on file by June 30, 2005,

pursuant to bar dates established by this Court under Bankruptcy Rule 3003(c)(3). The Debtor assumes the obligation to pay Membership Deposit Refund Claim for existing members who hold valid repayment obligations and who filed a proof of claim before the applicable bar date. Valid obligations will be paid by the Debtor when due according to the terms of the Membership Agreement. Class 5A claims are unimpaired.

**3.8 Class 5B – General Unsecured Claims for Membership Deposit Refunds with respect to members who have resigned for return of their deposits.** The Debtor will pay the Holders of Membership Deposit Refunds with respect to members who have resigned, ten cents on the dollar in full satisfaction of their Claims. These Claims shall be paid in full without interest or late payment fees on the later of thirty days after the Effective Date or the date such Claims become Allowed Claims. The Class 5B Claims are impaired.

**3.9 Class 6 – General Unsecured Claims of $1,000 or less.** The Holders of the Class 6 Claims shall be paid in full without interest or late payment fees on the later of thirty days after the Effective Date or the date such Claims become Allowed Claims. The Class 6 Claims are unimpaired.

**3.10    Class 7 - General Unsecured claims.** Holders of Allowed General Unsecured Claims will be paid their Allowed Claim amount from Available Cash.   The Class 7 Claims are impaired. The payment will be made with either

**3.10.1**      1) Until such time as the Property is refinanced or sold, the Class 7 Claim holder shall receive its Pro Rata share of Available Cash. Payments shall begin on the Payment Date and continue each quarter thereafter until the Property is refinanced or sold or the Claim is paid in full

**3.10.2**      2) Upon obtaining, sufficient refinancing or additional investment capital, the remaining amount of the Allowed Class 7 claims shall be paid in full without interest. If the Reorganized Debtor is unable to obtain sufficient capital to pay off these Claims in full in cash, then it will continue to make the quarterly payments described above.

**3.10.3**      3) If the Debtor is required to sell its property pursuant to Article 8 of the Plan, the net proceeds remaining after satisfaction of the Exit Financing, and Classes 1, 2, 4, and 5 will be paid pro-rata to holders of Allowed Class 7 Claims.

**3.11    Class 8 – Equity.** The existing Interest Holders will retain their Interests in the Debtor. The Interest Holders will not be entitled to any distributions with respect to their Interest until such time as all senior classes are paid in full. This provision does not prevent the Debtor from paying Interest Holders their regular salaries for managing the Debtor.   The Class 8 Interests are impaired.

**3.12    Available Cash Flow**.  Upon Confirmation and on the Effective Date set forth in the Plan, the Debtor shall commence making quarterly payments to general unsecured Creditors (class 7) holding Allowed Claims.  Payments will be made from Available Cash Flow, which is defined in the Plan.  The claims may also be satisfied by liquidation of the company, and payment of the Allowed Claim pro-rata.

Article 4
**The Debtor**

**4.1    General Description of Operations**.    Raveneaux, Limited is a Texas limited partnership organized for the purpose of owning and operating the Raveneaux Country Club.  The club is described in Section 2.1 above.

**4.2    Pre-Petition Financing and Capital Structure.**

**4.2.1    Real Estate First Lien.**  The Debtor had pre-petition, first lien real estate debt owed to NationsCredit.  That debt was premised upon an appraisal of the Debtor's property in the amount of $14,000,000 at the height of the golf craze in 1997.  The Debtor obtained a loan for approximately $9,250,000.  Thereafter, the loan was transferred to others.  Currently, Steamboat Capital, II, L.L.C. claims to own the note and deed of trust.  As of the petition date, the approximate principal balance on this First Lien was $8,139,000.  Steamboat claims the amount is closer to $8.5 million, adding in, *inter alia*, penalties and charges

**4.2.2    Second Lien.**  The Debtor's property is also encumbered by a second lien in favor of Small Business Administration.  The second lien is for repairs made to the club after Tropical Storm Allison damaged some of the course.  The original principal balance was $263,000.  At the time of bankruptcy, the outstanding balance was approximately $168,000.

**4.2.3    Third and Fourth liens (subordinated)**.  Certain insiders have claimed to hold prepetition liens on the Debtor's real property based on money loaned when the Debtor began its financial crisis after the Golf bubble burst.  These claimants include, Janet Brittain, Kate Mower, Dennis Evans, Jerry Sides and Mike Watford.  To the extent liens are alleged they are either unperfected, undocumented, or voluntarily subordinated.  The amount due is approximately $1,137,500.

**4.2.4    Other Secured Debts.**  The Debtor has prepetition secured debts to certain equipment finance companies for the acquisition of golf course equipment and carts.  This is approximately $460,000 and is owed to Citicapital, GE Capital, Ingersoll Rand, Sterling Bank, and the Right Bank for Texas.

**4.2.5    Taxes.**  The Debtor paid all real estate taxes, but as of the petition date, owed approximately $30,000 for year 2004 personal property taxes.

**4.2.6   Priority debts**. On the petition date, the Debtor owed payroll to employees. However, by order of the Bankruptcy Court on the first days of the case, that payroll was satisfied.

**4.2.7   Trade Debt**. On the petition date, the Debtor owed money to vendors for unsecured extensions of credit on such items as food, pro shop supplies, maintenance services and similar trade. Based on a preliminary analysis the amount of trade debt is approximately $288,000 with $23,600 of this amount representing claims of less than $1,000. There are also several other unsecured claims which cannot be categorized directly as trade debt and which may be disputed to some extent. These are claims held by Von Hagge, Smelek, Baril in the amount of $395,595, and C.W. Stubbs in the amount of $87,979.

**4.2.8   Membership Claims**. As described in Section 3.7 above, the Debtor owes refunds to members who joined and paid membership deposits under a membership agreement that was used by the debtor from 1978 to 1987. These obligations have not yet come due. The gross amount of these claims is approximately $7 million. Based on a preliminary analysis of claims, the dollar amount of claims in this category which have been filed is approximately $1 million.

**4.2.9   Administrative Expenses.** The primary administrative expenses in this case are attorney fees for the Debtor and the Creditors Committee. The Debtor estimates that these fees will be approximately $150,000. Pursuant to the cash collateral order and the interim fee procedures order a substantial amount of these fees will be paid out of cash flow prior to confirmation. However, due to the holdback in the interim fee procedures order and fees incurred during the month of confirmation, there will be a balance due upon confirmation of approximately $50,000.

 

**4.3   Debtor's Financial Information**. The Debtor has filed bankruptcy schedules, statements and monthly operating reports with the Bankruptcy Court, and are available for review at the office of the clerk, 515 Rusk, Houston, TX 77002.

**4.4**   The schedules, as filed by the Debtor are summarized as follows, with adjustments made for the appraised value of the real property:

**ASSETS**

| | |
|---|---:|
| Cash (including reserve funds) (est.) | $14,000 |
| Accounts Receivable | $307,000 |
| Real Estate (per appraisal) | $12,900,000 |
| Furniture, Fixtures and Equipment | $896,000 |
| Miscellaneous | $ 50,000 |
| Total Assets | $ 14,167,000 |

**LIABILITIES**

| | |
|---|---:|
| First Lien on Real Estate | $8,139,000* |
| Second Lien on Real Estate | $168,000 |
| Personal Property Taxes | $30,000 |
| Debt Secured by Equipment | $460,000 |
| General Unsecured Debt | $1,674,000 |
| Membership Deposits | $7,864,000 |
| Total Liabilities | $ 18,335,000 |
| **Equity (Assets > Liabilities)** | **($4,168,000)** |

\* A claim for this debt has been filed in the amount of $8,456,000 plus interest and attorney fees.

**4.5     Events Leading to Bankruptcy.** Raveneaux has operated continuously since 1979. It is well known as a Country Club in Houston Texas. It is immediately adjacent to Champions Golf Club, among the most prestigious golf courses in Houston. Unlike a "golf club", Raveneaux is a country club with a spacious clubhouse and banquet facilities. Raveneaux has several profit centers apart from golf. The Debtor makes money off of food and drink sales, usage fees, banquet facility rentals, member and guest fees and merchandise sales and dues. Membership dues are the most important, comprising half of the Debtor's gross receipts. Membership fell dramatically after the dot-com crash and relocation of nearby Compaq.

    **4.5.1     Golf Bubble.** Golf became a very trendy sport in the late 1990's. The golf industry bubble tracked the creation of "dot com millionaires". New golf courses sprouted around the country, and the number of courses in Houston exploded. Raveneaux attracted new members from Compaq, who located their headquarters nearby. However, along with the dot-com bubble bursting, the popularity of golf waned. Membership also began to drop.

    **4.5.2     Economic Downturn.** In 2003, Compaq computers was merged with HP – who relocated the corporate headquarters to California. This directly affected membership. Likewise, members who could afford memberships during the dot-com boom found themselves cutting back on luxuries such as country club memberships. Other clubs in Houston became more competitive. For the golf purist who does not need a 40,000 square foot clubhouse, the Debtor became a less attractive option. Membership declined, which made it more difficult for the Debtor to maintain the premises

    **4.5.3     Steamboat stakes out the Debtor** The Debtor committed minor defaults on certain provisions of its note with NationsCredit (then transferred to an affiliate of Bank of America). The defaults were promptly cured. NationsCredit

placed the note up for sale. At that time, Steamboat began investigating the debtor as a possible acquisition target. Steamboat communicated with ClubCorp, a large corporation that owns several golf clubs in the Houston Area. Steamboat (using Club Corp) visited the Debtor's facility in early 2004. Likewise, Steamboat discussed taking an equity position in Raveneaux by acquiring the note and foreclosing -- with Club Corp managing the property. Steamboat estimated that, if free cash flow were increased as the result of improvements, Raveneaux would be worth $16-17 Million.

**4.5.4**   **Steamboat Buys the Note**   Steamboat then bought the first lien note for 92.5% of face value. Immediately upon purchase of the Note, Steamboat sent notice of default to the Debtor based on non-monetary defaults (such as submission of unaudited financial statements). Steamboat also approached the Debtor, accompanied by representatives of ClubCorp as "consultants".

**4.5.5**   **Steamboat tries to foreclose.**   For months after Steamboat sent notice of the non-monetary defaults on the note, the Debtor continued to pay Steamboat. Steamboat eventually sued the Debtor. The Debtor ceased paying Steamboat. Steamboat sought a receiver to take over the business of the Debtor, forcing the Debtor to seek the protection available under the bankruptcy code to preserve assets for the other creditors.

**4.6**   **Operations in Bankruptcy.**   The Debtor has continued to operate as a debtor in possession in this bankruptcy case. The membership decline has slowed. The Debtor has a budget and has been able to meet its obligations during the course of the bankruptcy. The Debtor has regularly exceeded cash flow projections. The Debtor has been using the Cash Collateral of Steamboat, granting replacement liens on the post-bankruptcy income generated from the Debtor's operations. The Debtor has changed certain staff, changed the compensation for staff involved in membership recruitment, and has engaged a professional turnaround consultant to suggest methods of improving profitability.

## Article 5
## Significant Events during the Chapter 11 Case

**5.1**   **Litigated Matters.**   This Bankruptcy Case has had a significant amount of initial activity resulting from the interplay between Steamboat and the Debtor. The Debtor litigated four matters, two of which are still pending. The Debtor believes that Steamboat quickly sought to derail the bankruptcy in an effort to take the property for its own use. Unsurprisingly, Steamboat disagrees with that view.

**5.2**   **Cash Collateral.**   Immediately upon the filing of the voluntary petition, the Debtor sought authority to use cash. The cash was pledged as collateral on the First Lien Note. Steamboat objected to use of the cash collateral on several occasions. The Debtor and Steamboat eventually reached agreement as to the use of cash collateral pursuant to a budget set forth by the Debtor. The budget has been complied with pursuant to the terms of the Agreed Cash Collateral Orders.

**5.3**   **Lift Stay Hearing and Appraisal.**   An automatic stay prevents creditors in a bankruptcy case from taking certain action, including foreclosing on assets. The automatic stay of

the Bankruptcy Code (11 U.S.C. §362) exists so that creditors may have an organized payment of the debts instead of a race to seize assets. Steamboat sought to lift the bankruptcy stay and foreclose on the Debtor's assets early in the case. The Debtor opposed this relief. The Committee also opposed the relief because a foreclosure would give all of the Debtor's assets to Steamboat, leaving none for other creditors. The parties litigated this issue with appraisals and experts. The Debtor's experts, a turnaround consultant and an appraiser, found that the Debtor was well-managed and that the real estate was worth $12.9 Million, respectively. Steamboat's experts argued that the property was worth less than $9 million and that the property was not well managed. The Court found that the club was being well managed and that the property was worth in excess of the lien held by Steamboat. Accordingly, the court determined that Steamboat was adequately protected by its collateral and the stay should remain in effect.

**5.4     Suit Against Insiders**. Insiders of the Debtor (Mr. Kindred and Mr. Kirkham) were sued by Steamboat on personal guarantees. This suit was removed from state court to the Federal Court. Steamboat moved to remand the case back to the state court. The Debtor successfully contested remand. Steamboat filed a motion for summary judgment to establish liability and obtain a judgment against Mr. Kindred and Mr. Kirkham. Mr. Kindred and Mr. Kirkham have responded. That motion has not been set for hearing yet.

**5.5     Suit by the Committee and Debtor**   The Debtor and the Committee have sued Steamboat to invalidate the Steamboat claim and to liquidate the amount owed to Steamboat. The suit challenges Steamboat's lien because of an apparent irregularity in the chain of title on some security filings. The suit also challenges Steamboat's claim because of $35,000 in "forbearance" payments Steamboat received prior to bankruptcy. The suit also challenges Steamboat's title to the promissory note itself, among other things.

**5.6     Exit Financing**   The Debtor is in the process of seeking and expects to make use of at least $500,000 in exit financing, secured by a first lien on the Debtor's real property.

Article 6
**Executory Contracts and Unexpired Leases**

**6.1     Assumption of Certain Executory Contracts and Leases**. The Plan proposes that certain listed executory contracts and leases will be assumed, and all others rejected. In addition, the Plan proposes that those leases and executory contracts listed on Exhibit 6.4 of the Plan are to be assumed. All other leases and contracts are rejected. A list of contracts to be rejected is also contained in Exhibit 6.4 of the Plan. The Debtor may amend Exhibit 6.4 prior to or at the hearing on confirmation of the Plan.

**6.2     Proof of Claim Required.**   Holders of claims for damages for rejected executory contracts and leases will receive a General Unsecured Claim (class 7) if and only if a timely filed proof of claim is filed by the holder with respect to such a Claim. To be timely filed, such proofs of claim must be filed with the Court and served in accordance with Section 6.5 of the Plan by thirty (30) days after entry of the Confirmation Order or by such earlier date as may be fixed by an order of the Court authorizing rejection of the contract or lease. Any Claims not filed within such times shall be forever barred from assertion against the Debtor or the Reorganized Debtor. Claims

for damages from the rejection of any such leases and contracts, if Allowed, shall constitute Class 7 Unsecured Claims entitled to share Pro Rata with other Allowed Class 7 Unsecured Claims.

**6.3     Limitations on Damages**.  The Allowed Amount of Claims for the rejection of executory contracts and leases may be limited by various provisions of the Bankruptcy Code.  For example, claims for damages from the rejection of leases may be limited to a fraction of the actual damages; claims for certain employment agreements may be limited to one year; claims for interest are generally disallowed.  Holders of claims arising from the rejection of executory contracts or leases are urged to consult counsel in order to protect their rights.

Article 7
**Forecast Financial Results**

**7.1**  See the pro forma financial statements attached as Exhibit 7.1.  These financial statements indicate the Debtor believes that it can fund the payments required under the Plan and continue to operate.

Article 8
**Liquidation Analysis**

**8.1 Methodology**.   The starting point in determining the amount which members of each impaired class of unsecured claims and interests would receive in a Chapter 7 case is to estimate the dollar amount that would be generated from the liquidation of the Debtor (the "Liquidation Proceeds").  The Liquidation Proceeds of the Debtor would consist of the proceeds from the sale of all of the assets of the Debtor, augmented by the cash held by the Debtor.  The present value of the distributions from the Liquidation Proceeds are then compared with the present value offered to each of the classes of unsecured claims and interests of each such class.

**8.2 Analysis.**   A detailed Liquidation Analysis is attached as Exhibit 8.2.  The analysis reflects that if adequate time were allowed to market the property, all administrative, priority, and secured creditors would be paid in full with a balance left over to pay unsecured creditors of approximately $_____.  The ultimate return to the unsecured creditors would depend on the allowed amount of the Membership Deposit Refund Claims.  If Membership Deposit Refunds Claims are allowed in the amount of $_____, the general unsecured creditor class could receive _____ cents on the dollar.  On the other hand, if the plan fails and the secured creditors are permitted to foreclose, the unsecured creditors stand to receive nothing.  Therefore, since unsecured creditors under this plan may receive more than this amount, Debtor submits that the unsecured creditors will receive more than they would receive in Chapter 7 proceeding.

Article 9
**Risks Posed To Unsecured Creditors**

The Debtor does not believe there are any risks posed to unsecured creditors if its Plan is confirmed.  However, if the Plan is not confirmed, the unsecured creditors stand a serious risk of

loss. The reason for this is that if the Plan is not confirmed the case will be either converted or dismissed with the potential results described in Article 10 on Alternatives.

Article 10
**Alternatives**

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful. These alternatives include conversion to a Chapter 7 or dismissal of the proceedings. The Debtor of course, believes the proposed Plan to be in the best interests of creditors. The Debtor assesses the alternatives as follows:

**10.1**    The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy. If this occurred, the Bankruptcy Court will appoint a trustee to liquidate the Debtor's assets for the benefit of its creditors. The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion. Such administrative expenses include the Chapter 7 Trustee's commissions, as well as fees for professionals retained by the Chapter 7 Trustee to assist in the liquidation. The Trustee's commissions are based on disbursements to creditors. The Trustee receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million. Moreover, these services would likely duplicate services performed by professionals during the Chapter 11 case for which the estate would essentially have to pay twice.

**10.2**    Dismissal of the proceeding may result in numerous lawsuits to collect debts. Further, as indicated herein, substantially all of the assets of the Debtor are encumbered by liens held by creditors who would likely foreclose. Thus there would be no assets available for other creditors to collect against. Even if there were unencumbered assets, the creditors who receive quick judgments will be able to execute and recover their claims leaving nothing for the remaining creditors.

**10.3**    The Debtor has attempted to set forth alternatives to the proposed Plan. However, the Debtor must caution creditors that a vote must be for or against the Plan. The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance what course the proceedings will take if the Plan fails acceptance.

Article 11

**Bar Date and Administrative Claims Bar Date**

**11.1    Bar Date Defined**. The Bankruptcy Code allows the Court to require that persons who want may be owed money from the Debtor (and thus hold Claims) must file a "proof of claim" in the Bankruptcy Court before a certain date. That date is called the "bar date". In this case, the bar date for most proofs of claim to be on file with the Court is June 29, 2005. (See Docket #22).

**11.2    Administrative Expense Claims Bar Date.**  Any application for payment of administrative expense, including payments sought under 11 U.S.C. §503(b), 11 U.S.C. §330, and 11 U.S.C. §506(c) (including Steamboat's Counsel's claim for fees), or other similar provision of law must be filed within 30 days after the Confirmation Order becomes a Final Order.  These claims will be subject to the claims allowance and disallowance process set forth in the plan and will be paid when and if they become Allowed Claims.

**11.3    Membership Deposit Refund Claims Bar Date.**  Membership Deposit Refund Claims have a special bar date of either June 15 or June 30, 2005, depending on when the claimant was mailed notice of the bar date.  The claims must be filed by the applicable Bar Date

**11.4    Bar Date for All Other Claims.**  The Bar Date for all claims that are not Membership Deposit Refund Claims, Rejection Damage Claims or administrative expenses is June 29, 2005.

**11.5    Effect of Untimely Claim.**  If any Creditor has not filed a claim by the applicable Bar Date, it is disallowed.  The Plan shall constitute an objection to all Claims by Holders who have not filed a Proof of Claim or Application for Payment of Administrative Expense by the applicable Bar Date.  The Confirmation Order shall constitute an order disallowing all Claims that were filed after the applicable Bar Date or for which no timely Proof of Claim or Application for Payment of Administrative Expense was filed.

Article 12
**Impairment Of Claims And Resolution Of Claim Controversies**

**12.1**    The Plan contemplates that only Holders of Allowed Claims and Interests will vote. In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the confirmation date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Case.  In addition, the Bankruptcy Court may in accordance with section 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

**12.2**    Payments to each holder of a Contested Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs.  With respect to any Claim that is a Contested Claim on the Effective Date, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Contested Claim becomes a Final Order or a Contested Claim otherwise becomes an Allowed Claim, the Reorganized Debtor shall distribute to the holders of such Claim any Cash payment, without interest, that would have been distributed to such holder if the Claim had been Allowed on the Effective Date.

**12.3**   No later than 90 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made.

**12.4**   As to any Contested Claim, upon request for an estimate under Bankruptcy Code §502(c), the Bankruptcy Court shall estimate the Contested Claim for the purpose of allowing the Reorganized Debtor to fix the maximum distribution to which such disputed Claim will be entitled. Within 90 days after the Effective Date, the Reorganized Debtor shall object pursuant to §502(a) of the Bankruptcy Code, or otherwise seek to fix the amount of any unliquidated Claim.

Article 13
**Implementation Of Plan**

**13.1**   The basis of the Plan of Reorganization is as set forth above.

**13.2**   **Means for Execution of Plan.**  Debtor shall continue to operate the Property post-confirmation, make substantial improvements to the Property and implement the Plan as follows:

    **13.2.1**   On or before the Confirmation Date, the Debtor shall obtain a loan in the amount of at least $500,000 secured by a super priority first lien on the Property.  The loan proceeds shall be used to make payments required upon the Effective Date and to make improvements to the golf course including the refurbishment of greens and bunkers and the replacement of worn out paths.

    **13.2.2**   Upon the Effective Date, the Reorganized Debtor will make all payments required by the Plan.

    **13.2.3**   During the twenty-four month period following the Effective Date, the Reorganized Debtor will attempt to obtain refinancing and/or a new equity investor sufficient to pay off the Exit Financing along with Classes 1, 2, and 4 and 7 in full.

    **13.2.4**   If the Reorganized Debtor fails to obtain such financing or equity by the expiration of twelve months from the Effective Date, then it will list the Property in Accordance with Article 8.

**13.3**   **Management of the Debtor**.

    **13.3.1**  The Reorganized Debtor will be managed by Tony Kindred or an entity controlled by him as the general partner.  Mr. Kindred will receive a salary of $130,000 per year  and Mr. Kirkham will be employed as the membership director at a salary of $100,000 per year.

**13.3.2** Mr. Kindred's curriculum vitae is attached as Exhibit 13.3.2. It demonstrates that Mr. Kindred has had years experience in the business of operating Golf Clubs, that he has operated this club as his business for years, and that he has the educational background to operate the club in the future.

Article 14
**Post-Confirmation Protections**

**14.1    Injunction. From and after the Effective Date, all Holders of Claims against Raveneaux that exist on the date of entry of the Order Confirming Plan are permanently restrained and enjoined from continuing, or taking any act, to enforce such Claims against Raveneaux or any of its assets or properties as well as any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such Holder filed a Claim; provided, however, notwithstanding any provision in the Plan to the contrary, nothing herein shall effect the right of any Holder of a Claim to prosecute its proof of Claim (including without limitation any proof of Claim or application for payment of an Administrative Claim that any professional retained by Court order during the Raveneaux reorganization case may hereafter file in accordance with this Plan in the Bankruptcy Court or such other Court to which the matter may be referred) and all Holders of Claims shall be entitled to enforce their rights under the Plan. The injunction shall extend to the Debtor's General Partner and Mr. Kirkham to the extent payments required by the Plan are current. In the event of an uncured default, Creditors who hold Claims against the Debtor, the General Partner and Mr. Kirkham may proceed to exercise their state law remedies against them.**

**14.2    Discharge. On the Confirmation Date the debtor shall be discharged from any debt that arose prior to such date to the extent provided by 11 U.S.C. §1141.**

Article 15
**Tax Considerations**

**15.1    Introduction.    THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN OF THE SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR AND TO HOLDERS OF CLAIMS AND INTERESTS.   NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE ("IRS").   MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.   IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE**

RELEVANT TO THE DEBTOR OR HOLDERS OF ALLOWED CLAIMS AND INTERESTS, NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAXPAYERS (SUCH AS LIFE INSURANCE COMPANIES, S CORPORATIONS, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS). NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED. THEREFORE, THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. THIS SUMMARY IS BASED ON THE TAX CODE, TREASURY REGUATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF MAY HAVE RETROACTIVE EFFECT AND COULD THEREFORE SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW.

**15.2    Consequences to Creditors and Holders of Interests**.  The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on the origin of the holder's Claim, when the holder's Claim becomes an Allowed Claim, when the holder receives payment in respect of his Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to his Claim, and whether the holder's Claim constitutes a "security" for federal income tax purposes.

**15.3    Realization and Recognition of Gain or Loss in General**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.  Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim is held as a capital asset.

**15.4    Information Reporting and Backup Withholding**.  Under the backup withholding rules of the Tax Code, holders of Claims may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims may be required to

establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**15.5   Consequences to Debtor**.  In general, the discharge of a debt obligation by the obligor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount and less the amount of any previously amortized bond issue premium) gives rise to cancellation-of-indebtedness ("COD") income which must be included in the obligor's income for federal income tax purposes, unless payment of the liability would have given rise to a deduction.  COD income is not recognized by a taxpayer that is a debtor in a title 11 case if a discharge is granted by the court or pursuant to a Plan approved by the court ("bankruptcy exclusion rules").

**15.6   Attribute Reduction**.  The relief accorded to COD income by the bankruptcy exclusion rules is not without cost.  If a taxpayer excludes COD income because of the bankruptcy exclusion rules, it is required to reduce prescribed tax attributes in the following order: (1) net operating losses ("NOLs") for the taxable year of the discharge and NOL carryovers to such taxable year, dollar for dollar; (2) general business credit carryovers, 33-1/3 cents for each dollar of excluded income; (3) the minimum tax credit available under section 53(b) of the Tax Code as of the beginning of the taxable year immediately following the taxable year of the discharge, 33-1/3 cents for each dollar of excluded income; (4) capital losses for the taxable year of the discharge and any capital loss carryover to such taxable year, dollar for dollar; (5) the basis of the taxpayer's assets, dollar for dollar, but the basis cannot be reduced below the taxpayer's aggregate liabilities immediately after the discharge; (6) passive activity loss or credit carryovers of the taxpayer under section 469(b) of the Tax Code from the taxable year of the discharge, dollar for dollar in the case of loss carryovers and 33-1/3 cents for each dollar of excludable income in the case of credit carryovers; and (7) foreign tax credit carryovers, 33-1/3 cents for each dollar of excluded income.  However, the taxpayer may elect to avoid the prescribed order of attribute reduction and instead reduce the basis of depreciable property first, without regard to the "aggregate liabilities" limitation.  This election extends to stock of a subsidiary if the subsidiary consents to reduce the basis of its depreciable property.

**15.7   Anticipated Debt Reduction**.  The Debtor anticipates a reduction in the amount of its indebtedness according to the reduction in Class 7 claims and subordination of insider claims and the disallowance of certain member refund claims.  However, the discharge of debts in Bankruptcy is not usually a taxable event.  (see Section 15.5 above)

**15.8   Importance of Obtaining Professional Assistance.  THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN IS COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING SUCH TAX CONSEQUENCES.**

Article 16

**Causes of Action**

**16.1    Preferences**.  Under the Bankruptcy Code, a debtor-in-possession or trustee may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries.  Transfers made in the ordinary course of the debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable.  Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property.  If a transfer is recovered by the debtor, the transferee has an Unsecured Claim against the Debtor to the extent of the recovery.  The Debtor's schedules and statements list a large number of payments made within these preference periods.  No preferences are believed to exist, however, except for the "forbearance" payment to Steamboat.  Nevertheless, any creditor should be aware that payments received within the preference period may be recoverable in a subsequent action by the Reorganized Debtor.

**16.2    Fraudulent Transfers**.  Under the Bankruptcy Code and various state laws, the Debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the debtor insolvent.  It is possible that transfers to or for the benefit of the insiders (including Mike Watford) made within four years of the filing of the Bankruptcy petition were fraudulent transfers under the Texas Uniform Fraudulent Transfer Act, or otherwise recoverable under Sections 544, 548, and 550 of the Bankruptcy Code, or other law.  Likewise, it is possible that the "forbearance" payments made to Steamboat may be avoidable as fraudulent transfers.

**16.3    Suit Against Steamboat**.  The Debtor and Committee sued Steamboat.  The basis of the suit is discussed above in paragraph 5.5.  This suit alleges, *inter alia*, preferential and fraudulent transfers against Steamboat.

**16.4    Potential Recoveries of Transfers**.  The Debtor conducted a limited analysis of potential recoveries under Chapter 5 of Title XI and found only two – that against Mike Watford for payment of a debt within the year preceding bankruptcy and that against Steamboat for forbearance payments.  Any and all avoidance actions and rights pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550 and 553 of Title XI, United States Code, and all causes of action under state, Federal or other applicable law shall be retained and may be prosecuted or settled by the Reorganized Debtor.  To the extent that material amounts are recovered, it will enhance the returns to the holders of Interests.

Article 17

**Claim Objection Procedures, Treatment Of
Disputed Claims And Procedure For Bringing Claims By Debtor**

**17.1   Objection Process**.   The Reorganized Debtor shall have the exclusive right to object to the allowance of any Claims provided for under the Plan.

**17.2   Claims Objections**.   Objections to claims may be filed after the Effective Date of the Plan.   Creditors should not vote in favor of the Plan on the assumption that no objection will be filed to their claim.

**17.3   Known Claims**.   The Debtor filed a list of all known Claims as its schedules and statements.   These schedules are available for review at the office of the clerk of the Bankruptcy Court or at the offices of Debtor's counsel during regular business hours.   If your Claim is not listed or if it is listed in a manner that is incorrect, you may be required to take immediate legal action to protect your rights.   You may wish to consult an attorney to protect your rights.   Persons wishing to file Claims will be required to meet strict legal standards for the late filing of a Claim. **DO NOT VOTE FOR THE PLAN ON THE ASSUMPTION THAT YOU WILL HAVE AN ALLOWED CLAIM.   ONLY THE BANKRUPTCY COURT CAN ULTIMATELY DETERMINE WHETHER YOUR CLAIM WILL BE ALLOWED.   NO OTHER ENTITY-INCLUDING THE DEBTOR, ITS OFFICERS AND COUNSEL CAN ASSURE YOU THAT YOUR CLAIM WILL ULTIMATELY BE ALLOWED.**

**17.4   Filing of Claims**.   After confirmation, the Reorganized Debtor shall have the exclusive right to file and prosecute any claims or causes of action that could lead to disallowance of the claim arising under Chapter 5 of the Bankruptcy Code.   The Reorganized Debtor shall have the exclusive right to file and prosecute any claims or causes of action arising under State or Federal law, which claims or causes of action are property of a Debtor's estate under § 541 of the Bankruptcy Code.

**17.5   Settlements**.   The Reorganized Debtor may settle any claim or cause of action, without the approval of or notice to any other person or entity.

**17.6   Objection Deadline.**   No later than 90 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made.

**17.7   No Distributions Pending Allowance.**   Only Allowed claims may be paid.   No distribution shall be made with respect to any Contested Claim or Interest, even if a portion of the Claim or Interest is not disputed, until the entire Claim or Interest within the applicable Plan Class is resolved by a Final Order. For Claims Allowed under the Plan, the Confirmation Order shall be deemed to be the order resolving such Claim.

**17.8   Allocated Distributions.**   As to any disputed Claim, upon  request for an estimate under Bankruptcy Code §502(c), the Bankruptcy Court shall estimate the disputed Claim for the purpose of allowing the Reorganized Debtor to fix the maximum distribution to which such disputed Claim will be entitled.   Within 90 days after the Effective Date, the Reorganized Debtor shall object pursuant to §502(a) of the Bankruptcy Code, or otherwise seek to fix the amount of any unliquidated Claim.

**17.9    Class 1 Claim of Steamboat.** Claim objections have been timely filed to disallow this claim. The Reorganized Debtor will prosecute this objection in the name of the existing Plaintiffs without being bound by any admission made by the Debtor, unless such admission would also bind the other Plaintiff.

**17.10    Distribution After Allowance.** Payment to each holder of a disputed Claim, to the extent it ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan  governing the class of claims to which the disputed claim belongs. Payments will commence on the next Payment Date occurring after the order or judgment of the bankruptcy court in which the order or judgment of the bankruptcy court allowing such claim becomes a Final Order and is not subject to appeal,   The money shall be distributed on a going-forward basis, together with all interest or other earnings actually earned thereon to the date such distributions are made, except that interest shall accumulate as of the Effective Date.

**17.11    Treatment of Contingent Claims.** Contingent Claims shall not be paid unless they are Allowed Claims before the Confirmation Order is entered.

**17.12    Distributions to Holders of Disputed General Unsecured Claims**. At such time as an unsecured Disputed Claim becomes an Allowed Claim, any Distributions for such Allowed Claim shall commence on the next Payment Date

**17.13    Distributions to Holders of Disputed Secured or Priority Claims**.   No distribution shall be made to the holder of a Disputed Claim which is a Secured Claim or a Priority Claim until the Court determines by Final Order that such Secured Claim or Priority Claim is an Allowed Claim. To the extent the claim was secured by a lien, the lien is limited to the amount of the Allowed Claim.

**17.14    Provisions Governing Distributions**.

    **17.14.1 Delivery of Distributions**. Subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims will be made at the address of each such holder as set forth on the proofs of claim filed by such holders, or at the last known address of such holder if no proof of claim is filed or if the Reorganized Debtor has been notified in writing of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Reorganized Debtor is notified in writing of such holder's then current address.

    **17.14.2 Unclaimed Distributions and Uncashed Checks**. All claims for un-deliverable distributions must be made on or before the later of the first anniversary of the Effective Date of the Plan, or one hundred eighty (180) days following date on which such distribution is first mailed.  After such date, all unclaimed distributions will revert to the Reorganized Debtor and the Claim of any holder with respect to such distribution will be discharged and forever barred.  Checks issued in respect of Allowed Claims will be null and void if not negotiated within six (6) months after the date of issuance thereof.

Article 18
**Requirements For Confirmation Of The Plan**

**18.1    Confirmation Hearing**.   Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  Pursuant to the Order Under 11 U.S.C. § 1125 and Bankruptcy Rule 3017 Approving Disclosure Statement and Fixing Time for Filing Acceptances and Rejections to Chapter 11 Plan of Reorganization entered by the Bankruptcy Court on _____, 2005, the Confirmation Hearing has been scheduled before the Honorable Karen K. Brown on _____, 2005, at _____ ____.m., in the United States Courthouse, 515 Rusk Avenue, Houston, Texas  77002.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

**18.2    Objections**.   Section 1128(b) provides that any party in interest may object to confirmation of the Plan. However, an impaired Creditor, who votes to accept the Plan, may not have standing to object to the Plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court.  Any objection to confirmation must be made in writing and filed with the Bankruptcy Court with proof of service and served upon and actually received by the following persons on or before 4:30 p.m. on _____, 2005:

Ed Rothberg
Weycer, Kaplan, Pulaski & Zuber
11 Greenway Plaza, Suite 1400
Houston, Texas 77046

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**18.3    Statutory Requirements for Confirmation of the Plan**.   At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

**18.3.1**  The Plan complies with the applicable provisions of the Bankruptcy Code.

**18.3.2**  The proponents of the Plan complied with the applicable provisions of the Bankruptcy Code.

**18.3.3**  The Plan has been proposed in good faith and not by any means forbidden by law.

**18.3.4**  Any payment made or to be made by the Reorganized Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the case, or in connection with the Plan and

incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

**18.3.5**  The proponents of the Plan have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint Plan with the Debtor, or a successor to the Debtor under the Plan; and (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and (b) the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider.

**18.3.6**  Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

**18.3.7**  With respect to each class of impaired claims or Interests:

18.3.7.1   each holder of a claim or interest of such class has accepted the Plan; or

18.3.7.2   will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

18.3.7.3   if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secured such claims.

**18.3.8**  With respect to each class of claims or interests such class has accepted the Plan; or such class is not impaired under the Plan; or the requirements of § 1129(b) of the Bankruptcy Code are satisfied;

**18.3.9**  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

18.3.9.1   with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

18.3.9.2   with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive:

18.3.9.2.1   if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

18.3.9.2.2   if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

18.3.9.2.3   with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

**18.3.10**   If a class is impaired under the Plan, at least one class of claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider.

**18.3.11**   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

**18.4**   The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the requirements of chapter 11, and that the proposal of the Plan is made in good faith.

**18.5**   The Debtor further believes that the holders of all Claims and Interests impaired under the Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtor was liquidated in a case under chapter 7 of the Bankruptcy Code.

**18.6**   The Debtor also believes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization, but provision for liquidation is made in the Plan itself in case the Debtor cannot timely obtain refinancing.

Article 19
**Cramdown**

**19.1    Explanation of Cramdown Procedures**.  In the event that any impaired class of Claims and Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.

**19.2    Fair and Equitable Standard**.   "Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

**19.2.1**  With respect to a class of secured claims, the Plan provides:

19.2.1.1   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

19.2.1.2    for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

19.2.1.3    for the realization by such holders of the indubitable equivalent of such claims.

**19.2.2**  With respect to a class of unsecured claims, the Plan provides:

19.2.2.1    that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

19.2.2.2    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.

**19.2.3**  With respect to a class of interests, the Plan provides

19.2.3.1    that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation

preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

19.2.3.2   the holder of any interest that is junior to the interests of such class will not receive or retain under the Plan on account of such junior interest any property.

**19.3    Hearing**.   The Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims and Interests.   The Debtor believes that the Bankruptcy Court will find these requirements satisfactory and will confirm the Plan.   The Debtor also believes that "cramdown" will not be required.

**19.4    Notice of Intentions**.   The Debtor intends to invoke the Cramdown procedures only if the Plan is not approved by all classes of creditors entitled to vote and a class is impaired.   The Debtor believes that the Plan satisfies all requirements in order to obtain approval under the Cramdown procedures of the Bankruptcy Code.

Article 20
**Voting Procedures And Requirements**

**20.1    Ballots and Voting Deadline**.   A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement.   A Creditor or Interest Holder who is voting must (1) carefully review the ballot and instructions thereon, (2) complete and execute the ballot indicating a vote to either accept or reject the Plan, and (3) return the executed ballot to the address indicated thereon by the deadline specified by the Bankruptcy Court.   Pursuant to the Order Under 11 U.S.C. § 1125 and Bankruptcy Rule 3017 Approving Disclosure Statement and Fixing Time for Filing Acceptances and Rejections to the Plan of Reorganization, the Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtor by 4:30 p.m. Houston time, on _____, 2005.

**20.2    Mailing Instructions**.   If you hold an impaired Interest or Claim against the Debtor, return your ballot to:

WEYCER, KAPLAN, PULASKI & ZUBER, P.C..
Hugh M. Ray, III
11 Greenway Plaza, Suite 1400
Houston, TX. 77002

TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY 4:30 P.M. HOUSTON TIME ON _____, 2005.

**20.3    Persons Entitled to Vote**.   Any party in interest who holds an impaired Claim or Interest under the Plan is entitled to vote.   Holders of Disputed Claims or Interests are not entitled to vote on the Plan, unless allowed by Court Order.

**20.4    Voting Procedures**.   Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor in its sole discretion, and such determination will be final and binding.   The Debtor reserves the right to reject any Ballot not in proper form, the acceptance of which would, in their opinion or the opinion of their counsel be unlawful.   The Debtor further reserves the right to waive any defects or irregularities or conditions or delivery as to any particular Ballot.   The interpretation by the Debtor of the provisions of this Disclosure Statement and the Ballots will be final and binding on parties in interest unless otherwise directed by the Bankruptcy Court.   Unless waived, any defects or irregularities concerning deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines.   Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of  Ballots nor will any of them incur any liability for failure to provide such notification.   Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made until all defects and irregularities have been cured or waived, and will be invalidated.

**20.5    Vote Required for Class Acceptance**.  The Bankruptcy Code defines acceptance of a Plan of reorganization by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed Claims of the class actually voting to accept or reject the proposed Plan of reorganization.

**20.6    Withdrawal of Plan**.  If the Plan is not accepted by all classes of impaired Interest Holders, the Debtor reserves the right to withdraw the Plan.

Article 21

**Conclusion**

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms. Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

**Dated:**                                    **June 24, 2005**

                                         **Houston, Texas**

_____

**ANTHONY M. KINDRED, GENERAL PARTNER OF
RAVENEAUX LIMITED**

**Of Counsel:**

**WEYCER, KAPLAN, PULASKI & ZUBER, P.C.**

By:_____

   Edward L. Rothberg
   State Bar No. 17313990
   Hugh M. Ray, III
   State Bar No. 24004246
   1400 Summit Tower
   11 Greenway Plaza
   Houston, TX 77046
   Telephone: (713) 961-9045
   Facsimile:   (713) 961-5341