# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No.  05-32734-H5-11 |
| Raveneaux Limited, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## STEAMBOAT CAPITAL II, L.L.C.'S OBJECTION TO CONFIRMATION OF DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION

DATED:  August 24, 2005,
          Houston, Texas.

Respectfully Submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

Zack A. Clement
State Bar No. 04361550
Johnathan C. Bolton
State Bar No. 24025260
R. Andrew Black
State Bar No. 02375110
Jason L. Boland
State Bar No. 24040542
Fulbright Tower
1301 McKinney, Suite 4100
 Houston, Texas 77010
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

**ATTORNEYS FOR
STEAMBOAT CAPITAL II, L.L.C.**

30966395.26

## TABLE OF CONTENTS

Page

I.  FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 1

II.  OBJECTIONS TO DEBTOR'S PLAN ............................................................................... 1

    A.  The Plan Was Not Proposed In Good Faith As Required By Section 1129(a)(3) ...................................................................................... 2

        1.  The Economic Essence of the Plan Demonstrates That the Plan Was Not Proposed In Good Faith ........................................... 2

            a.  The Plan Is Premised On Forcing Steamboat To Make An Involuntary, High-Risk Loan Which Debtor Could Never Obtain In The Market ...................... 3

            b.  The Plan Inappropriately Favors The Debtor's Current Management, Old Owners And Their Chosen Investor And Permits Them To Denude The Debtor Of Its Best Assets ...................................... 4

        2.  This Is A Classic Two-Party Dispute ............................................ 8

        3.  The Plan Proposes Other Unfair Dealing With Steamboat .......... 10

        4.  The Totality Of The Circumstances Demonstrates That The Plan Was Not Proposed In Good Faith ....................................... 12

    B.  The Plan Is Not Feasible And, Thus, Fails To Comply With Section 1129(a)(11) .................................................................................. 12

        1.  Debtor's Financial Performance Has Been Poor For The Past Four Years ............................................................................ 13

        2.  The Debtor's Management Will Not be Significantly Changed Post-Confirmation ......................................................... 15

        3.  Economic Conditions Have Not Changed .................................... 16

        4.  The Debtor Will Not Receive Sufficient Capital Contributions Under The Plan .................................................... 17

        5.  The Debtor's Has Provided Inadequate Support For Its Projections And Is Unlikely To Meet Its Stated Economic Goals ............................................................................................ 18

            a.  Even If Debtor Achieves Its Projected Income, It Will Not Be Able To Make Its Proposed Balloon Payments ................................................................. 19

            b.  Debtor Has Not Provided A Realistic Proposal To Improve Its Operations In Order To Meet Its Projections ................................................................. 20

            c.  Debtor's "Condo" Development Proposal Is Speculative ................................................................. 21

## TABLE OF CONTENTS
(continued)

Page

|   |   | d. | The Sale Of Debtor's "Crown Jewel" Real Estate Is Either Impermissible Or Impractical | 22 |

d.  The Sale Of Debtor's "Crown Jewel" Real Estate Is Either Impermissible Or Impractical ............................... 22

e.  Debtor's Optimistic And Unrealistic Projections Provide No Margin Of Error ........................................... 23

C.  The Plan Cannot Be Confirmed Under The Cramdown Provisions Of Section 1129(b) ................................................................... 24

   1.  The Plan Discriminates Unfairly Against Steamboat ................. 25

   2.  The Plan Is Not Fair And Equitable ............................................. 26

      a.  The Debtor's Proposed Deed Of Trust Would Materially Alter The Secured Obligations ...................... 27

         i.  The Proposed Deed Of Trust Strips Away Many Of Steamboat's Security Interests And Liens ............................................................. 29

         ii.  The Proposed Loan Documents Omit Material Covenants ............................................. 30

         iii.  The Debtor's Proposed Representations And Warranties Differ In Material Respects From The Existing Loan Documents ................... 31

         iv.  The Proposed Loan Documents Materially Alter What Constitutes An Event Of Default ...... 33

         v.  The Proposed Deed Of Trust Strips Steamboat Of Rights And Remedies ................... 33

         vi.  The Plan May Not Give Steamboat Any Personal Guaranty Of Payment ........................... 34

      b.  The Plan Proposes To Pay Steamboat An Unreasonably Low Interest Rate .................................... 35

      c.  Debtor's Plan Does Not Provide Steamboat With The Indubitable Equivalent Of Its Claim ........................ 38

D.  The Plan Does Not Provide That Creditors Will Receive At Least As Much As They Would In A Chapter 7 Liquidations And Thus, Does Not Comply With Section 1129(a)(7) ........................................... 42

   1.  The Plan Does Not Provide Steamboat With The Present Value Of Its Claim .................................................................... 43

   2.  Legitimate Creditors In This Case Would Receive Payment In Full In Liquidation, Rather Than Waiting And Risking Non-Payment Of Their Claims In The Future ........................... 44

## TABLE OF CONTENTS
(continued)

**Page**

E.      The Debtor Has Gerrymandered Classes Of Claims And, Thus,
        The Plan Does Not Comply With Section 1129(a)(1) ............................ 47

F.      The Plan Impermissibly Provides For Confirmation Based On The
        Votes Of Insiders And, Thus, Does Not Comply With Section
        1129(a)(10) ............................................................................................. 50

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Steamboat Capital II, L.L.C. ("Steamboat"), a secured creditor and party-in-interest in the above-captioned case, hereby files its Objection to Confirmation of the Second Amended Plan of Reorganization filed by Raveneaux Limited ("Debtor" or "Raveneaux") and in support thereof, would respectfully show the Court as follows:

## I.      FACTUAL AND PROCEDURAL BACKGROUND

1.      On February 24, 2005 (the "Petition Date"), Raveneaux filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[1]  Since the Petition Date, the Debtor has acted as a debtor-in-possession pursuant Sections 1107 and 1108 of the Bankruptcy Code.

2.      On August 2, 2005, Raveneaux filed its Second Amended Disclosure Statement Under 11 U.S.C. § 1125 in Support of Chapter 11 Plan of Reorganization Submitted by Raveneaux Limited, Debtor-in-Possession [Dkt. No. 173] (the "Disclosure Statement"). Thereafter, on August 3, 2005, the Debtor filed its Second Amended Plan of Reorganization [Dkt. No. 177] (the "Plan").  The Court approved the Disclosure Statement on August 3, 2005 and set August 24, 2005 as the deadline for filing briefs on confirmation issues.

3.      Steamboat is the Debtor's senior secured lender and has standing to file this Objection to Confirmation pursuant to Section 1128(b).

## II.     OBJECTIONS TO DEBTOR'S PLAN

4.      The Plan proposed by Debtor violates almost every requirement of Sections 1129(a) & (b) of the Bankruptcy Code.  The Debtor's Plan turns the absolute priority rule on its head by, among other things, preferring unsecured insider claims over claims of secured

---

[1] All references to "Section" shall, unless otherwise noted, be references to the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.*

creditors, giving old equity continued interests and upside potential and placing long-term credit risk on Steamboat and Raveneaux's Existing Members.  On its face, the Plan is unconfirmable.

### A.    The Plan Was Not Proposed In Good Faith As Required By Section 1129(a)(3)

5.    Pursuant to Section 1129(a)(3), a plan must be proposed in good faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(3).  The good faith inquiry focuses on examining the "totality of the circumstances" surrounding the proposed plan.  *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983).

6.    The "totality of the circumstances" surrounding Debtor's Plan illustrates that it is unfair in many respects and is <u>not</u> a reorganization proposed in good faith.  The Debtor has, among other things, explicitly excluded Steamboat from consideration to provide a needed capital infusion, used the Plan to strip away Steamboat's collateral, and forced on Steamboat a commercially unreasonable loan, based on an infeasible business plan.  The Plan, which is not fair and equitable, discriminates unfairly against Steamboat, and does not provide Steamboat as least as much as it would receive in a Chapter 7 liquidation.

### 1.    The Economic Essence of the Plan Demonstrates That the Plan Was Not Proposed In Good Faith.

7.    The Plan is not proposed in good faith because it does not provide for the expeditious resolution of disputes and speedy payment to creditors.  *See In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34, 38 (Bankr. S.D. Ind. 1986).  The Plan proposes to use the power of this Court to delay payment of Steamboat for seven years (paying it only approximately 1/9[th] of its principal in that period of time) and to "reinstate" its Existing Members claims for a refund of their

initiation fees so that they too will have to wait many years.  Meanwhile, as discussed below, substantial numbers of insider creditors will be paid in full much sooner.

     **a.**  **The Plan Is Premised On Forcing Steamboat To Make An Involuntary, High-Risk Loan Which Debtor Could Never Obtain In The Market**

  8.  Debtor's $9.1 million secured loan obligation to Steamboat has now fully matured at the end of its term.  To enable its scheme, the Plan would require Steamboat to make a new involuntary seven year loan for that amount, with a thirty year amortization, under which, even if Debtor meets its goals in its speculative business plan, less than $1 million of Steamboat's principal will be paid back in seven years.  The Plan makes no provisions for funding this balloon payment to Steamboat.

  9.  Further, the Plan materially alters or eliminates the existing covenants, warranties, rights and remedies and reduces both the scope and breadth of the lien obligations in Steamboats' existing Loan Agreement and Deed of Trust and divests Steamboat of collateral currently securing its claim. (*See* Plan, § 4.1, p. 9).

  10.  The Plan compounds this unfairness by coupling this high-risk loan with a proposed interest rate fixed at 7.5% instead of the adjustable rate under the now-matured loan. On the afternoon of August 25, 2005, which Debtor knew Steamboat was the deadline to file this pleading, Debtor filed a Plan Modification [Dkt. No. 290] increasing the interest rate it proposed to pay to Steamboat above the 6.5% it had originally proposed (which was lower than the current rate under the now matured loan and merely equal to today's prime rate of interest – *i.e.* without a risk premium).[2]  Even though this modified rate is 1% over the current prime rate of interest (which has risen steadily every time the Federal Reserve Bond has met over the past year, and is

---

[2] Debtor has not filed any amended projections and has not indicated whether it will now re-solicit acceptances for its Plan with any such new projections.

likely to do so in the future), it is still not adequately compensatory for the reasons discussed at length below.  There is nothing fair, equitable or good faith about the involuntary loan proposed in the Plan.

        **b.**       **The Plan Inappropriately Favors The Debtor's Current Management, Old Owners And Their Chosen Investor And Permits Them To Denude The Debtor Of Its Best Assets.**

11.     The mechanism proposed by the Debtor to fund the Plan is the creation, on the Effective Date, of a new partnership, JP/Raveneaux Partners LP, referred to in the Plan as the "Project Ownership Entity," which will be the entity in control of the Raveneaux Country Club and which will be liable under the Plan to pay debts owed to Steamboat and Raveneaux's Existing Members.   All of Raveneaux's real property will be transferred to the Project Ownership Entity by the Debtor which will be deemed to have made a capital contribution of $250,000 to this new partnership.   JP Realty Partners, L.P., the Debtor's new investor, will become a limited partner in the new partnership, and will contribute a total of $2.5 million as a "capital contribution."   Finally, an as yet unformed entity named Raveneaux Management, Inc. (defined in the Plan as the "Kindred General Partner" and consisting of the Debtor's current principals) will be deemed to contribute $277,777.78 as a capital contribution.  Debtor's current equity owners will initially own 10% of this new investor partnership, and can, over time, obtain up to a 50% ownership interest in this new investor partnership.

12.     A close review of the Limited Partnership Agreement of JP/Raveneaux Partners LP attached as an Exhibit to the Plan (the "Partnership Agreement"), reveals that Debtor is proposing a scheme through which the new investor can force the Project Ownership Entity to convey Steamboat's collateral to another entity controlled by the new investor for a bargain price, without specifically requiring that all the proceeds be paid to Steamboat, thus leaving

Steamboat with no recourse and reduced security for its debt.  Further, the Debtor's current owners, principals and insiders will be granted profits interests in this related entity.

13.     The first paragraph of Section 4.10 of the Partnership Agreement provides as follows:

> The JP Limited Partner may, without the consent of the Kindred Partners, elect to subdivide some or all of that portion of the Project depicted on Exhibit C (the "First Eligible Tract") to create a separate parcel or separate parcels of not more than twelve acres for the development of any residential or commercial (including retail) project(s) permitted by applicable law.  Additionally, JP Limited Partner may, without the consent of the Kindred Partners, cause the Partnership to convey such subdivided parcel(s) within or comprising the First Eligible Tract into a separate entity controlled by JP Realty Partners, L.P. (at a sales price equal to $1.00 per net square foot for the portion so subdivided, which sales price will be paid in cash upon the conveyance by the Partnership), which entity may include additional investors and/or partners." JP Limited Partner shall grant the Kindred Partners (or their Affiliate designee) a 10% profits interest to be paid out of JP Limited Partner's (or its Affiliate designee's) interest in such separate entity, following a return of all capital invested by JP Limited Partner (or its Affiliate designee) in such separate entity.

(Partnership Agreement, ¶4.10, p. 10) (emphasis added).

14.     The 12 acres described in Exhibit C to the Partnership Agreement (comprised of Raveneaux's acreage with road frontage and the only portion not located in the flood plain) are the "crown jewel" of the Debtor's real estate.  Most of the remainder of Debtor's real estate is located in the flood plain and flood way and cannot be built on without a tremendous amount of engineering, back fill, drainage control and Harris County Flood District approval.

15.     Through the mechanisms set up by the Plan, in return for the $2.5 million it will "invest," JP Realty Partners LP can obtain the most developable real property of the Raveneaux Country Club from the new Project Ownership Entity at the "bargain" price, even though this

non-flood plain, non-flood way real estate is worth <u>much more</u> than the remaining flood plain and flood-way property.

16. All the Project Ownership Entity would ever receive from the transfer of the crown jewel property is $522,720.[3]  However, both JP Realty Partners, L.P. and the Kindred Limited Partner <u>get to share in the upside</u> after any condominiums, residential structures, commercial structures or retail structures are added to the property, by participating in the profits from these proposed improvements to the exclusion of Steamboat or the Debtor's legitimate creditors, including its Existing Members.

17. Similarly, the second paragraph of Section 4.10 of the Partnership Agreement allows JP Realty Partners, L.P. to force the subdivision and conveyance of an additional 50 acres of Steamboat's collateral (essentially the remainder of the buildable land).  Again, the Project Ownership Entity will only receive $1.00 per square foot for the conveyance of such property and will <u>not</u> be able to participate in the upside if the property is developed.  However, the Debtor's insiders will receive a 10% net profits interest which will be increased to a 30% if certain conditions are met.

18. Shortly after it obtained its note, Steamboat offered the Debtor's old owners a deal for an equity infusion providing for a sharing of any upside in the Debtor's property. However, the Debtor chose not to negotiate with Steamboat.[4]  Indeed, the Debtor has said explicitly in its Disclosure Statement, that it does not wish to make this ownership opportunity available to Steamboat, who, without this Chapter 11, would have foreclosed and owned the Debtor's properties.  Instead, the Debtor has proposed that the new "equity" investor, in addition

---

[3] 43,560 sq. ft. / acre x 12 x $1 = $522,720.

[4] The Debtor complained, among other things, that it needed a Confidentiality Agreement from Steamboat's chosen business consultants, Club Corp. of America.  Steamboat obtained and provided the Debtor with such an agreement, but the Debtor complained that this Agreement was not good enough and continued to refuse to negotiate with Steamboat.

to taking the crown jewels for itself at a bargain price (and giving a percentage interest to the Debtor's principals), will be repaid at a 10% rate of interest (not 7.5% like Steamboat). This dissimilar treatment illustrates not just discrimination against Steamboat, but shows how the Plan has been structured not with the economic interests of the legitimate creditors in mind, but with the goal of giving the upside of this venture to old equity owners, preserving the jobs of current management,[5] and leaving the Existing Membership and Steamboat with the long-term downside risk. This is a complete reversal of the order of priorities contained in Section 1129(b) of the Bankruptcy Code.

19.     In its Plan, the Debtor seeks to do what the Supreme Court prohibited in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434 (1999)—use the power of the exclusivity period to force on the secured lender a plan in which old owners keep their ownership and have (in this case, with their chosen additional investor) the sole right to invest in a real property project on which, but for the debtor's bankruptcy, the secured lender would have the right to credit bid at a foreclosure sale. In *Bank of America*, the Supreme Court held the Plan was "doomed…by its provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan." *Id*. at 454. As the Supreme Court noted in *Bank of America*, "there is no apparent reason for giving old equity a <u>bargain</u>…unless the very purpose of the whole transaction is, at least in part, to do old equity a favor." *Id*. at 456. (emphasis added).

---

[5] Steamboat also objects to confirmation of the Debtor's Plan because it may not comply with Section 524(e) to the extent that an overly broad Release and Exculpation provision contained in Section 15.14 of the Plan seeks to relieve non-debtor third parties and the Debtor's principals from their guarantee obligations to Steamboat. *See NCNB Tex. Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994) (discharge of a debtor in reorganization proceedings does not affect a guarantor's liability); *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) (stating that Section 524 prohibits the discharge of debts of non-debtors). The Debtor should clarify whether any such release is intended through Plan Section 15.14.

20.     As in *Bank of America,* the Debtor has improperly used the exclusivity period to propose a plan of reorganization that gives to its current owners and their chosen new investment partner all of the future equity ownership of the Debtor's properties.  Essentially, the Debtor is attempting to use the Chapter 11 process to give its old equity a "bargain" by keeping the Debtor's principals in control, while at the same time forcing a commercially unreasonable loan on its existing lender.

21.     Clearly, the Debtor's insiders stand to gain while the remaining creditors of Raveneaux County Club, like Steamboat and the Existing Members, bear all the risk and must stand by while the Debtor is denuded of its best assets by the Debtor's principals and their new investor.  As such, the proposed structure of this new partnership arrangement effectively turns the "absolute priority rule" on its head.

### 2.     This Is A Classic Two-Party Dispute

22.     Debtor's Plan and Disclosure Statement illustrate that the Debtor is conducting this case to impose its will in a classic two-party dispute between Steamboat and the Debtor.  In *In re Little Creek Dev. Co. v. Commonwealth Mortgage Corp*., (*In re Little Creek Dev. Co*.), 779 F.2d 1068, 1072 (5th Cir. 1986), the Fifth Circuit stated that the "[r]equirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes."  In addition, the Fifth Circuit acknowledged that "[d]etermining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."  *Id*.; *see also In re Humble Place Joint Venture v. Fory*, 936 F.2d 814, 817-18 (5th Cir. 1991) (applying the *Little Creek* factors).

23.     The classic model of bad faith, according to *Little Creek*, is that of a single asset real estate debtor, such as Raveneaux, using the automatic stay to prohibit a secured creditor from foreclosing on the real estate.  *See also In re Syndicom Corp.*, 268 B.R. 26, 50 (2d Cir. 2001) (focusing on the following factors when determining whether cause exists for dismissal based on a bad faith filing: (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees).

24.     The Debtor filed for bankruptcy relief on February 24, 2005, on the eve of a hearing in which Steamboat sought appointment of a receiver and entry of a judgment against Raveneaux based on recitations set forth in an "Agreed Judgment" executed by Raveneaux's counsel on its behalf pursuant to Rule 11 Agreements.  The Debtor seeks to use the Chapter 11 process and the exclusivity period to keep equity ownership in the hands of its old owners (and their chosen investors), to never give Steamboat an opportunity to foreclose or to invest, to force on Steamboat a commercially unreasonable loan, all pursuant to a business plan unsupported by solid facts or realistic projections that shows a turnaround in Debtor's business that is entirely speculative.

25. On very similar facts, the court in *In re Investors Fla. Aggressive Growth Fund*, 168 B.R. 760, 767-68 (Bankr. N.D. Fla. 1994), denied confirmation and dismissed the case for bad faith based on the following factors:  the Debtor's primary asset was an apartment complex; the claims of the non-insider unsecured creditors of roughly $16,000 paled in comparison to the secured $6,000,000 claim; the Debtor filed its petition shortly before a hearing on the secured creditor's action to appoint a receiver, an action initiated only after the Debtor ceased making loan payments to the secured creditor; the case represented a two party dispute inasmuch as the Debtor was unsuccessful in renegotiating more favorable terms of the mortgage loan with its secured creditor; and the timing of the petition together with the Debtor's unsuccessful pre-petition attempts to re-negotiate with the secured creditor led the court to conclude that the petition was filed with the intent to forestall the secured creditor's collection rights and to unilaterally impose the mortgage terms deemed acceptable to the Debtor on an unwilling creditor.  According to the court, the Code was not to be viewed as an alternative to traditional refinancing by providing a vehicle for debtors to draft their own loans with existing creditors.  *Id*. at 768; *see also Computer Task Group, Inc. v. Brotby (In re Brotby),* 303 B.R. 177, 198 (B.A.P. 9th Cir. 2003) (filing of bankruptcy close in time to entry of large state court judgment indicated possibility of bad faith precluding confirmation).

### 3.  The Plan Proposes Other Unfair Dealing With Steamboat

26. The Debtor further illustrates its bad faith toward Steamboat by saying in its Disclosure Statement that it proposes to pursue fraudulent conveyance claims against Steamboat for small amounts paid as forbearance fees, while proposing not to pursue fraudulent conveyance claims against any other party, including, for example Debtor's owners Messrs. Kindred and Kirkham to whom $345,000 of payments were made during the year before Debtor's Chapter 11

petition (during most of which time the Steamboat loan was in default) and to other relatives and business friends (such as Mike Watford, Chairman of the Creditors' Committee).  Debtor's excuse for not pursuing these insiders is that, "since the Debtor is solvent and all creditors are being paid in full" there is no need to do so.  *See* Debtor's Second Amended Disclosure Statement, Sections 3.10-3.12 (emphasis added).  If the Debtor is truly solvent, there is no basis to bring a fraudulent conveyance action against Steamboat either, other than to harass Steamboat.

27.     Finally, pursuant to Section 8.5 of the Plan, Raveneaux attempts to vest in the Reorganized Debtor the ability to prosecute objections to Steamboat's claim without being bound by prior admissions made by the Debtor, including admissions made by the Debtor in Cash Collateral Orders and elsewhere.  *See* Debtor's Second Amended Plan of Reorganization, Sections 8.5 (emphasis added). The Debtor seeks to avoid its prior representations by "stepping into the shoes" of the Creditors' Committee, but not bringing with it the limitations of its own prior admissions.  A list of legal and factual admissions the Debtor has made in this case in response to Requests for Admissions and in response to Steamboat's Motion to Lift Stay is attached as **Exhibit A**.

28.     Steamboat would not have agreed to allow the Debtor to continue using its Cash Collateral without the admissions by the Debtor.  Indeed, in its Expedited Motion to Authorize Continued Use Cash Collateral [Dkt. No. 117], the Debtor argued that the Court should approve its continued use of cash collateral since "[t]he terms of the cash collateral order would not change from the *carefully negotiated terms of prior orders*."  (*See* Debtor's Expedited Motion to Authorize Continued Use Cash Collateral at ¶6 ) (emphasis added).  Yet, now, even though the reorganized Debtor's management will remain essentially the same, the Debtor is attempting to circumvent those prior admissions.  Such tactics evidence bad faith under Section 1129(a)(3).

**4.    The Totality Of The Circumstances Demonstrates That The Plan Was Not Proposed In Good Faith**

29.    All of the above amply demonstrate that the Plan was not filed in good faith.  In addition, in formulating its Plan, the Debtor has also, among other things, gerrymandered claims into separate classes in an effort to engineer an "impaired" accepting class, provided a flawed liquidation analysis which ignores avoidance actions and overstates liquidation costs and failed to comply with other applicable provisions of the Bankruptcy Code.  Therefore, judged by the totality of the circumstances, the Debtor's Plan has not been proposed in good faith, fails to comply with Section 1129(a)(3) and should not be confirmed.

**B.    The Plan Is Not Feasible And, Thus, Fails To Comply With Section 1129(a)(11)**

30.    Steamboat objects to confirmation of the Debtor's Plan because it is not feasible and cannot be confirmed under Section 1129(a)(11), which provides that the Court can only confirm a plan to the extent "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).  Debtor's Plan fails under this standard.

31.    Debtor's financial performance has continually declined over the past four years and there is no reason to expect that trend to reverse post-confirmation.  In the face of this poor performance, Debtor has proposed a Plan: (a) in which management will remain the same; (b) which makes little, if any, provision for dealing with market conditions that existed pre-petition and continue to exist and under which the Debtor has performed poorly; (c) which does not provide for the infusion of sufficient new funds, leaving the reorganized Debtor undercapitalized and without the capital improvements the Debtor has said it needed; (d) based on a completely speculative proposed real estate development with no description of where the capital will come

-12-

from to pursue it or how it will fare in the marketplace; (e) premised on ill-supported and unrealistic projections of operational success that, even if met, will not be sufficient to pay off Steamboat's secured debt; and (f) which provides no budget or escrow mechanism for the Plan's proposed balloon payment of over $8.2 million at the end of seven years (for Steamboat's principal) and for the return of Member Deposits (totally approximately $1.7 million).[6]  The Plan is not feasible and should not be confirmed.

### 1. Debtor's Financial Performance Has Been Poor For The Past Four Years

32.     The Debtor's performance over the past four years has shown a steady downward trend, year after year.   In 2004 alone, seventy-five (75) golf memberships were lost by the Debtor (down 10.84%) while 6,048 fewer rounds of golf were played (down 12.23% over 2003). Earnings Before Income, Taxes, Depreciation and Amortization (EBITDA) declined 36.83% in 2004 resulting in a Net Loss of $346,185 (a result 56.17% worse than in 2003).   In fact, during the previous four year period, the Debtor has not once achieved its budget for the year nor exceeded the prior year's actual performance.   Despite this well documented and undisputed poor financial performance, the Debtor is projecting unrealistic and unsustainable growth projections, including substantial rental income from proposed condominiums that are not yet even in the conceptual planning stages.

---

[6] These are the kind of factors that courts have generally looked to in a determining feasibility.  *See* Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1129.03[11] (15th ed. Rev. 2005) (noting that courts have considered several factors when determining if a plan is feasible, including:  (1)  the adequacy of the debtor's capital structure;  (2)  the earning power of its business; (3) the economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.  *See also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D. N.J. 2000); *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002) (acknowledging similar factors); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D. N.J. 1980); *In re Agawam Creative Marketing Assocs., Inc.*, 63 B.R. 612, 619-20 (Bankr. D. Mass. 1986) (citing similar factors and noting that "[o]ther factors include the prospective availability of credit and whether the debtor will have the ability to meet its requirements for capital expenditures"); *In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D. N.J. 1988) (citing similar factors).

33.    The Court cannot simply overlook the Debtor's historical poor operating results because of a few months during its Bankruptcy case in which the Debtor was able to meet or surpass its lowered projected revenues and cash flows.  *See In re Malkus, Inc.*, 2004 Bankr. LEXIS 2120, *10-11 (Bankr. M.D. Fla. 2004) (finding that "[a] debtor's past performance is one of the most important measures of whether a debtor's plan will suceed"); *In re Agawam Creative Marketing Assocs., Inc.*, 63 B.R. 612, 620 (Bankr. D. Mass. 1986) (finding that the financial progress made by the Debtor between 1984 and 1985 could not support the Debtor's projections in view of the thirty-year payout contemplated).[7]  In fact, the only reason the Debtor was able to meet or surpass its projected budget and cash flows for those few months during this Chapter 11 case was because it <u>continuously revised its budget and cash flow projections downward</u>.[8]

34.    Debtor's just-filed July 2005 monthly operating report vividly demonstrates how poorly the Debtor has performed since filing bankruptcy:

(a)    Gross Revenue was lower than for any month since the Petition Date;

(b)    EBITDA was negative for the first time since filing and has steadily declined over the past 3 months;

(c)    Debtor's net loss of $124,000, was its worst since filing and its losses have steadily increased over the past 3 months;

(d)    At the end of July, Debtor had only $3,900 in cash and Debtor's month-end cash balance has steadily declined over the past 3 months.  (In its Cash Plan, Debtor had projected that it would have a positive cash balance of $49,000)

(e)    Trade creditors are not being paid currently and $69,885 of trade payables is between 30-60 days old.

---

[7] S*ee also In re Atrium High Point Ltd. P'ship*, 189 B.R. 599, 609-10 (Bankr. M.D. N.C. 1995) (denying confirmation under Section 1129(a)(11) because (1) debtor's inability to meet financial obligations in past had forced lender to weather 4 defaults, 3 loan modifications and 2 Chapter 11 cases in less than 5 years, (2) it was more likely than not that debtor would not be able to attain projected 100 percent occupancy rate and, even if successful, would have great difficulty in meeting obligations as they become due, and (3) it was highly speculative that debtor who proposed to refinance or sell asset could find another bank willing to refinance its debt or could find buyer for property before proposed balloon-payment due date)

[8] For example, in this Court's April 26 Cash Collateral Order [Dkt. No. 79], the Debtor's Cash Plan indicated that for the week ending June 26, 2005, the Debtor would have a cash reserve of $55,157.00 and for the week ending July 3, 2005, the Debtor would have a cash reserve of $116,003.00.  Yet, under the Debtor's Cash Plan attached to this Court's July 14, 2005 Cash Collateral Order [Dkt. No. 159], <u>the Debtor adjusted these numbers downward</u>, providing that for the week ending June 26, 2005, the Debtor would have <u>negative -$16,120.00</u> (instead of a positive cash reserve of $55,157.00 as initially projected), and for the week ending July 3, 2005, the Debtor would have only $44,726.00 (instead of $116,003.00 as initially projected).

35. Further, in 2003, the Debtor had a net loss of $616,326. In 2004, the Debtor's worst year ever, the Debtor had a net loss of $962,511. For the five months it has been in bankruptcy for which it has filed operating reports, the Debtor already has a net loss of $454,907. The financial deterioration of the Debtor continues to gather speed and Debtor is on track to exceed its prior record loss.

**2.  The Debtor's Management Will Not be Significantly Changed Post-Confirmation**

36. The Debtor has proposed absolutely no changes in its management structure. The Debtor's purported reorganization merely involves bringing in a new "equity" partner, who will be initially entitled to 90% of the profits from the new investor partnership. Yet, according to the Disclosure Statement, this new equity partner will not run the day-to-day operations of the company. Prior management, including Mr. Kindred, will remain in control of the Reorganized Debtor. Other golf courses managed by Mr. Kindred have ended up in either foreclosure or bankruptcy, including Houston National Golf Course and Barton Creek.

37. Further, under Section 1129(a)(5)(A)(ii), the post-confirmation continuation of insiders in the control of a debtor <u>must be consistent with the interests of creditors.</u> Based the current management's poor track record in profitably managing the Debtor's operations, both before and after bankruptcy, and their failure to propose a plan in good faith as described herein, confirming the Plan would not be consistent with the interests of creditors based upon prior management's demonstrated ineffectiveness. *See generally* Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1129.03[5][b] (15th ed. Rev. 2005) (The public policy requirement enables a bankruptcy court to disapprove a plan in which "demonstrated incompetence or malevolence is a hallmark of the proposed management.").

### 3.      Economic Conditions Have Not Changed

38.      The Debtor blames its bankruptcy on several events, including a "golf bubble" and increased competition from new golf courses that were built during the golf bubble.  (See Disclosure Statement, Section 4.2.3, p.16).  Yet, the Plan proposes no operational changes to deal with these underlying economic challenges which will still exist if the Plan is confirmed.

39.      For example, the Debtor notes that during the "golf bubble," Raveneaux attracted new members from Compaq.  However, according to the Debtor, "with the dot-com bubble bursting, the popularity of golf waned." (See Disclosure Statement, Section 4.6.1, p.18).  This is still true.   Moreover, Compaq has merged with HP, which relocated its headquarters to California and announced major layoffs in the Houston area in the near future.  This will not change.  Thus, by the Debtor's own admission, it has irretrievably lost a large pool of potential members.

40.      Debtor also blamed its difficulties, in part, on the fact that a number of new golf courses were built in the Houston market during the late 90's and 2000's. (See Disclosure Statement, Section 4.6.1, p.18).  However, these new golf courses are still operating, offering a high quality product at a price lower than Raveneaux, and the Debtor will continue to have difficulty competing with them.

41.      Finally, the Debtor is located immediately adjacent to the Champions Golf Club, one of the most prestigious golf courses in Houston.  The Debtor admits that:  "For the golf purist who does not need a 40,000 square foot clubhouse, the Debtor became a less attractive option." (See Disclosure Statement, Section 4.6.2, p.19).    The Debtor says that, unlike a "golf club," however, the Debtor is a "country club with a spacious clubhouse and banquet facilities." (See Disclosure Statement, Section 4.6.2, p.18).  But, the Debtor has offered no concrete plans to

change its outmoded existing clubhouse, other than by adding condos several years in the future. The existing clubhouse operated by this management has not been sufficiently attractive to break even on food and beverage operations and there is no reason to expect they will become profitable in the future.

### 4.   The Debtor Will Not Receive Sufficient Capital Contributions Under The Plan

42.   As described above, the old owners are not contributing any new cash but will obtain interests in the new venture.  The new "equity" investor's $2.5 million, although classified as an "initial capital contribution," is contemplated to be paid back in full at a 10% interest rate. (*See* Plan, Section 6.1.01, p. 13),  Therefore, this "capital contribution" is more akin to a loan.

43.   Further, Debtor proposes to use the proceeds of the $2.5 million loan as follows: (1) $600,000 for refurbishment of greens and bunkers, (2) $100,000 for installation of a new waterline and $50,000 for replacement of worn our cart paths; (3) $515,000 to pay unsecured creditors; (4) $465,000 to pay off equipment obligations; (5) $400,000 for pre-development expenses; (6) $330,000 for closing costs[9]; and (7) only $40,000.00 will be reserved for "working capital."

44.   In February 2005, Raveneaux prepared an Investment Summary for potential investors, in which it said it needed approximately $1,150,000 for capital projects in 2005, almost twice as much as the Debtor proposes under the Plan.  This included fixing the irrigation system, renovating the bag storage room, resurfacing the tennis court, fixing the tennis/pool snack bar and renovating the clubhouse, pool, outdoor carpeting, parking lot and entry sign.

---

[9] The Debtor has provided no justification for this excessive amount, especially in light of the fact that former management will remain in control of the Reorganized Debtor.

None of these capital improvements are provided for in the Debtor's projections. See Exhibit B to the Plan.

45.     The Disclosure Statement states that additional capital investments for years 2008-2012 will be based "upon management's estimate of required capital expenditures." However, under the proposed Partnership Agreement, neither the JP Limited Partner nor the Kindred General or Limited Partner are obligated to make additional capital contributions.  (*See* Partnership Agreement, Section 6.3).   The Debtor's Pro Forma financials list capital improvement amounts but it do not indicate where that money is coming from.  The Debtor's Cash Flow Forecast does not contemplate additional "equity invested in Raveneaux Country Club."  In light of the Debtor's poor financial performance, it is unrealistic to expect that the Debtor will somehow convince a lender to loan additional money for further capital improvements.

### 5.     The Debtor's Has Provided Inadequate Support For Its Projections And Is Unlikely To Meet Its Stated Economic Goals

46.     Debtor's Plan is a visionary scheme because the Debtor has not provided adequate documentation of its assumptions and projections.  Visionary schemes are not sufficient to prove feasibility.  *In re Sovereign Oil Co.*, 128 B.R. 585, 587 (Bankr. M.D. Fla. 1991); *In re Investors Fla. Aggressive Growth Fund*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (stating that "[t]he purpose of the feasibility requirement under § 1129(a)(11) is 'to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation'") (quoting *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989); *In re Valley Park Group, Inc.*, 96 B.R. 16, 23 (Bankr.

M.D.N.Y. 1989) (denying confirmation in part due to Debtor's inability to substantiate its optimistic sales projections).

> a. **Even If Debtor Achieves Its Projected Income, It Will Not Be Able To Make Its Proposed Balloon Payments**

47. During its bankruptcy case, Raveneaux has been <u>barely</u> able to make its interest payments due to Steamboat. Despite this, under the Debtor's Plan, it must somehow come up with over $8 million to pay Steamboat at the end of seven years.[10] *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 509 (Bankr. S.D. Tex. 1989) (denying confirmation based upon a lack of feasibility of the Plan because even if the Debtor could have utilized net cash flow to stay current on its pay rate under the Notes prior to maturity, it had no source of funds with which to repay the principal debt at maturity); *In re M & S Assoc., Ltd.*, 138 B.R. 845, 851 (Bankr. W.D. Tex. 1992) (acknowledging that "[i]n assessing the feasibility of the Plan, the Debtor's ability to pay the balloon payments…must also be considered").

48. Debtor's operational projections make no provision for the accumulation of sufficient funds to pay off Steamboat's debt at the end of seven years. For this reason alone, the Plan is not feasible.[11] This is particularly troublesome because the Plan contemplates that the Debtor's best, most marketable real estate (on which Steamboat has a lien) will have been sold to a new entity (owned only by the new investor and the Debtor's insiders), leaving land only

---

[10] The Debtor's Plan also provides no mechanism to escrow fund for the future payment of membership liabilities, some of which become due in 2009. Accordingly, there is no assurance that cash will be available to pay these membership liabilities when these debts come due in the future since Raveneaux did not escrow these membership liability claims in the past, as they were required to do under the loan documents, which has now lead to many hundreds of members losing over $5,000,000 of cash deposits previously paid to the Debtor.

[11] S*ee also In re Edgewater Motel, Inc.*, 85 B.R. 989, 997 (Bankr. E.D. Tenn. 1988) (acknowledging that "[t]he longer a debtor intends to take in retiring plan obligations, the more difficult it may be to prove feasibility). The *Edgewater* Court found the ability of the debtor to retire the claim of its major secured creditor was at best speculative. *Id.* While the debtor projected a sufficient income to meet the payments proposed to various classes of creditors, the court, in view of the substantial amount of payments deferred by the debtor to Plan years six through eight, was not satisfied as to the ability of the debtor to meet its projections. *Id.*

effectively usable as a golf course, but with the golf course operations unable to generate sufficient cash to pay off Steamboat's debt.

>   **b.**   **Debtor Has Not Provided A Realistic Proposal To Improve Its Operations In Order To Meet Its Projections**

49.     While the Debtor maintains that it has "over 1200 members," the Debtor continues to lose golf members, and the number of golf rounds played has declined in the first six months of 2005 by over 900 rounds compared to the same period in 2004.  Both membership and rounds must increase in the future for Debtor even to meet its projections, yet the Debtor has not presented a market analysis or business plan describing how it intends to turn its operation around to stop the continuing loss of golf members, attract new members and increase the rounds of golf played.

50.     The Debtor has assumed that food sales will increase 2.5% per year and eventually provide positive cash flow, despite the fact that the Debtor has admitted that, "Raveneaux rarely makes money from its food and beverage sales."  In fact, Raveneaux even acknowledged that losses in the food and beverage department "is typical of all country club operations."  *See* Debtor's Second Amended Disclosure Statement, Section 4.6.

51.     With no concrete plan to increase its income, the Debtor's economic model is unrealistic, the projected goals are unattainable and the Plan is not feasible.  *See In re Hoff*, 54 B.R. 746, 752-53 (Bankr. D. N.D. 1985) (finding that the debtors' Chapter 11 plan did not meet 11 U.S.C. § 1129(a)(11) because predicted income was unrealistic and in amounts never before attained by debtors in history of their operation); *In re Great Northern Protective Services, Inc.*, 19 B.R. 802, 804 (Bankr. W.D. Wash. 1982) (denying confirmation due to feasibility where nothing in the debtor's history existed to support or expect that the requisite sums indicated in

the plan could be realized); *In re Stapleton*, 55 B.R. 716, 721 (S.D. Ga. 1985) (finding that the debtors' assumptions were unreasonable and the fulfillment of the Plan was unattainable).

### c.   Debtor's "Condo" Development Proposal Is Speculative

52.   Further, Debtor's forecasts for 2009-2012 <u>assume substantial revenue</u> from the addition of 25 condominium rooms which will be rented through Raveneaux Country Club.  The Debtor has not indicated how much additional investment will be required to construct these condos;[12] where this additional investment will come from; how it will be economically feasible; and what financial results it will produce for Debtor.  Additionally, the Debtor has provided no evidence to support its assumptions that it will immediately be able to rent out its rooms at $125.00 per night with a 60% occupancy rate and increase that occupancy rate by 5% each year.  These assumptions are simply not based on any reliable evidence.

53.   This vague real estate development proposal is not sufficient to prove feasibility. *See In re Mahoney*, 80 B.R. 197, 202 (Bankr. S.D. Cal. 1987) (denying confirmation on the grounds that the plan was not feasible and violated the best interests test because the primary method of funding for the plan was by developing real estate, yet no construction budget for project had been prepared, no market survey had been done and no lenders were approached to determine willingness to lend money); *In re Investors Fla. Aggressive Growth Fund*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (acknowledging that "[p]lans which extensively rely on sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where that asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan"), *see also In re Sound Radio, Inc.*, 93

---

[12] Further, the Debtor admits that "several acres are in the flood plain and cannot be built on without flood planning and prevention."  Yet, the Debtor has not obtained any engineering, flood or other studies to support this statement.  Steamboat presented evidence to the Court at the hearing on its Motion for Relief from Stay which showed that between 90-95% of the Debtor's land is located in the flood plain and a significant portion of that land is actually located in the flood way.  The Debtor's have provided no information or studies as to the feasibility of building or developing in this flood way.

B.R. 849, 855-56 (Bankr. D. N.J. 1988) (regarding feasibility, "the court is required to predict, <u>based on the historical data provided by the parties</u>, whether the debtor will be able to make all the payments under the plan and to comply with the plan…<u>All income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic.</u>") (emphasis added).

> ### d. The Sale Of Debtor's "Crown Jewel" Real Estate Is Either Impermissible Or Impractical

54.     Further, as described above, the new "equity" investor can force the Project Ownership Entity to sell up to 62 acres of the most valuable land owned by the Debtor at a bargain price.  However, under the Proposed Deed of Trust described further below, if the Project Ownership Entity sells any part of the land securing Steamboat's note without obtaining the prior written consent of the Steamboat,[13] then Steamboat will be entitled to declare the debt secured by the Proposed Deed of Trust immediately payable pursuant to Section D.19 of the Proposed Deed of Trust. [14]  Section D.12 of the Proposed Deed of Trust provides that any successor in interest of the Project Ownership Entity is bound by the terms of the Proposed Deed of Trust.

55.     In addition to the right to declare the debt immediately due, Steamboat retains its lien on any part of the land that the Project Ownership Entity (or its successors) may sell and any purchaser of any part of that real property would take title subject to Steamboat's lien.  Finally, the Deed of Trust does not contemplate a partial release of liens on the land in the event Steamboat consents to the sale of same or otherwise.

---

[13] Steamboat does not consent to any such sale.

[14] Were Steamboat not to have such a due on sale clause, as it does under its Existing Deed of Trust, that would involve a significant and impermissible reduction of Steamboat's existing collateral and lien rights.  See sections C.2.a & c below.

56.     In light of the foregoing, Section 4.10 of the Partnership Agreement appears to be economically impracticable, unless the Debtor's intent is to try to use the Plan to impermissibly strip Steamboat's existing lien on the real estate.  If that is not the Debtor's intent, then any entity purchasing any part of the Debtor's real estate risks losing some or all of its investment in the event the Project Ownership Entity defaults under the Proposed Loan Documents and Steamboat later forecloses on its lien on all or any part of the real estate, including any land previously sold. As a practical matter, no investor will be willing to undertake such a risk and invest capital under these conditions.

### e.     Debtor's Optimistic And Unrealistic Projections Provide No Margin Of Error

57.     In view of these factors, there is no reason to believe Debtor's projections seven years into the future.  There is certainly no reason to believe that the Debtor can pay off Steamboat's entire principal.  *See In re Belco Vending, Inc.*, 67 B.R. 234, 238 (Bankr. D. Mass. 1986) (finding that as a result of the debtor's unrealistic projections, a mere five percent margin of error would cause a shortfall under the plan); *see also In re Agawam Creative Marketing Associates, Inc.*, 63 B.R. 612, 621-22 (Bankr. D. Mass. 1986) (finding that debtor's Chapter 11 plan will not be confirmed under 11 U.S.C. § 1129(a)(11) where, *inter alia*, the plan was to be funded for 30 years out of operating revenues but cash flow projections were unrealistic, as demonstrated by debtor's previous inability to be profitable; ending cash positions did not provide sufficient cushion in event debtor's assumptions were wrong or there was a downward trend in economy which would adversely affect debtor; and debtor's history of repeated amendments and absence of third party able or willing to infuse debtor with new capital provided a clear indication that confirmation would likely be followed by need for further reorganization). In *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507-08 (Bankr. S.D. Tex. 1989), the court stated:

> When virtually all the income generated from the property 'is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code.'
>
> Certainly when the net cash flow estimates are incredible or simply unrealistic, in the judgment of the trial court, the court must find that the plan is not feasible.  When the financial realities do not support the projections or where the proponents' projections are unreasonable, the plan should not be confirmed.  (internal citations omitted).

58.     Putting aside the Debtor's hypothetical plan to build condominium units and proposed capital improvements of $600,000 (half of what the Debtor has recently said it needs to make promptly), the Debtor's Plan is to continue to do essentially what it has done in the past. As the court in *In re Champion Oil Co.*, 13 B.R. 472, 474 (Bankr. S.D. Ohio 1980) stated:

> We deny confirmation of debtor's plan for the following reasons. An analysis of the plan proposed together with the accompanying financial background of which we are made aware by the record in this case, indicates that <u>debtor in no way contemplates a change in its mode of operations</u>.  No infusion of capital is to occur.  <u>Debtor believes, notwithstanding the unfortunate history of the enterprise, that it will somehow become viable, by simply continuing its present operation.</u>  Not only does debtor contend that it will be profitable enough to sustain its current operation, but it contends that it will be so successful that it will be able to pay off the creditors who have been held at bay by the present filing in the bankruptcy court.  <u>The history of debtor yields not the slightest reason to believe that this will happen.</u>  (emphasis added).

59.     Like the court in *Champion Oil Co.*, this Court should find, based on the history of the Debtor, the Plan proposed by the Debtor is not feasible and should not be confirmed.

### C.     The Plan Cannot Be Confirmed Under The Cramdown Provisions Of Section 1129(b)

60.     Steamboat is the sole holder of a Class 1A Secured Claim, which is classified as impaired, and has voted to reject the Plan.

61.     If all the applicable requirements of Section 1129(a) are met (other than (a)(8)), a court may confirm a plan under Section 1129(b), only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b).

62.     The Plan proposed by the Debtor discriminates unfairly against Steamboat which holds the highest priority claim in the case, but is receiving the worst treatment (in the form of the longest stretch-out period, at below market interest rate).   Additionally, the Plan is not fair and equitable to Steamboat because it forces on Steamboat a commercially unreasonable loan with altered and inadequate collateral, covenants, warranties and liens and fails to provide Steamboat the indubitable equivalent of its claim.

### 1.     The Plan Discriminates Unfairly Against Steamboat

63.     The Debtor's Plan treats Steamboat's claim on less favorable terms than most other creditors.   The Debtor has proposed to change Steamboat's currently floating annual percentage rate (APR) to a fixed 7.5% APR.   This is one of the lowest interest rate being paid to any creditor.   Next, the Debtor's Plan proposes to stretch out Steamboat's claim for a longer period of time than any other creditor, which effectively means that all other creditors (except for membership deposit claimants, who will be paid according to their contract terms) will be paid ahead of Steamboat.[15]   Third, the Plan states that the Debtor will sue only one party, Steamboat, based on $35,000 of forbearance fees that the Debtor now claims was a fraudulent conveyance,

---

[15] Under the Plan there are seven groups that will be paid in full ahead of Steamboat: (1) general unsecured claims totaling somewhere between $515,000 to $603,000 (Class 6A), which the Debtor claims will be paid in cash in full on the later of 30 days after the Effective Date or the date such Claims become Allowed Claims; (2) smaller secured claims totaling $472,000 (Class 1B), which will be paid either in full on the later of 30 days after the Effective Date or the date such Claims become Allowed Claims; (3) the secured claim of the Small Business Administration (Class 1C), which is junior to Steamboat but will be paid within 3 years; (4) claims of family-related Insiders (Class 3), who will have special deals not yet specified; (5) claims of other Insiders due to their close relationship with the Debtor (Classes 6B, C and D), who will be paid in full over two to five years at interest rates of 8% to 10%; (6) claims of current and former members of Raveneaux Country Club based on membership deposit agreements that will either be reinstated or paid early at a discount; and (7) the "investment" of JP Realty Partners, LP, which will be repaid at 10% interest.

even though the Debtor believes it is "solvent" and will not pursue as a fraudulent conveyance the $345,000 that was paid to two of Debtor's principals in the year before this Chapter 11 case was filed.

## 2. The Plan Is Not Fair And Equitable

64. The Plan is also not fair and equitable with respect to Steamboat's senior secured claim. Section 1129(b)(2) of the Bankruptcy Code provides:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of **secured claims**, the plan provides—
>
> (i)  (I) that the holders of such claims **retain the liens securing such claims**, whether the property subject to such liens is retained by the debtor or transferred to another entity, **to the extent of the allowed amount of such claims**; **and**
>
> (II) that each holder of a claim of such class receive on account of such claim **deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property**;
>
> …; or
>
> (iii) for the realization by such holders of the **indubitable equivalent** of such claims.

*See* 11 U.S.C. § 1129(b)(2).(emphasis added).

65. When interpreting Section 1129 of the Bankruptcy Code, the Fifth Circuit has explained "[i]n determining a statute's meaning, 'the beginning point must be the language of the statute.'" *In re Cajun Elec. Power Co-op., Inc*., 150 F.3d 503, 513 (5th Cir. 1998) (quoting *Estate of Cowart v. Nicklos Drilling Co*., 505 U.S. 469, 474 (1992)).

66. The Plan does not allow Steamboat to "retain the liens" securing its claims since the Debtor proposes to take away all of Steamboat's existing Loan Documents and replace them

with a simple 2-page Promissory Note and a 6-page Deed of Trust (both from a newly formed partnership) which does not contain many of the terms, conditions, covenants, warranties, rights and obligations and liens that were originally bargained for.

67.     The Debtor's Plan does not propose to give Steamboat deferred cash payments totaling at least the value of its secured claim as of the Effective Date.

68.     Finally, the Plan does not allow Steamboat to realize the "indubitable equivalent" of its claims under the Plan, because it takes a fully matured loan, stretches it out over seven years based on a 30-year amortization, takes away liens, collateral and covenants,[16] and does not propose to pay Steamboat the present value of its claim over time.  Therefore, the Plan is not fair and equitable with respect to Steamboat.[17]

### a.     The Debtor's Proposed Deed Of Trust Would Materially Alter The Secured Obligations

69.     Under the Plan, the Project Ownership Entity will execute a new deed of trust in favor of Steamboat (Plan, § 4.1, p. 9).  The proposed deed of trust is attached to the Plan as Exhibit 6.1.03 (the "Proposed Deed of Trust").

70.     There are numerous <u>material differences</u> in both the scope and breadth of the secured obligations between the Proposed Deed of Trust and the Deed of Trust that Steamboat currently holds and owns (the "Existing Deed of Trust").  The Existing Deed of Trust not only secures Raveneaux's obligations set forth therein, but also secures Raveneaux's obligations

---

[16]*See In re Bernard*, 70 B.R. 181, 186 (Bankr. E.D. Ark. 1986) (stating "[t]o constitute the indubitable equivalent of Land Bank's claim, the debtors must propose to execute a new first mortgage or deed of trust to Land Bank with <u>substantially all of the provisions of the original prepetition mortgage or deed of trust and . . . a new note . . . containing substantially the same terms and conditions as the original promissory note.</u>" (emphasis added).

[17]In the case of *In re Edgewater Motel, Inc.*, 85 B.R. 989, 998-99 (Bankr. E.D. Tenn. 1988), the Bankruptcy Court denied confirmation of a plan in which the Debtor proposed to convert a fully-matured loan into a twelve year loan.  The Bankruptcy Court, in denying confirmation, found that the secured creditor's situation would be "substantially the same position at the end of the ten year life of the Plan as it occupies today."  *Id.* at 998.

provided in (1) the Loan Agreement[18] and (2) any promissory note or other instrument entered into in connection therewith (including the Original Note),[19] (3) the Security Agreement, (4) the Limited Guaranty, (5) the Environmental Indemnity, (6) the Assignment of Permits and Contracts, (7) the Pledge Agreement, and (8) the Financing Statements (each of which are defined in the Loan Agreement) (collectively, the "Existing Loan Documents").

71.     In contrast, the Proposed Deed of Trust that Steamboat is to receive from the Project Ownership Entity secures only those obligations of the Project Ownership Entity set forth in that document (which does not contain any description of the real property collateral) and in the proposed 2-page promissory note.

72.     The Court should not allow the Debtor to materially alter Steamboat's bargained-for rights and remedies set forth in the Existing Loan Documents.  *See In re Hoffman*, 52 B.R. 212, 216 (Bankr. D. N.D. 1985) (stating: "It has become increasingly apparent from recent appellate decisions that the disruption of interests in property caused by bankruptcy cases must be minimal or non-existent…Generally, the source of a creditor's interest in collateral is the terms and conditions contained in a security agreement reached with the debtor.  Alteration of those terms and conditions disrupts the creditor's rights and interests in collateral.  In that connection, this Court will not allow substantial disruption of bargained-for rights which accompany interests in property and collateral.") (emphasis added).  *See also In re Briscoe Enters., Ltd. II*, 994 F.2d 1160 (5th Cir. 1993).

---

[18] The "Loan Agreement" means that certain Loan Agreement dated October 3, 1997 (the "Loan Agreement"), between Raveneaux and Nations.

[19] The "Original Note" means that certain Promissory Note dated October 3, 1997, executed by Raveneaux payable to the order of Nations in the original principal amount of $9,250,000.

        **i.**      **The Proposed Deed Of Trust Strips Away Many Of Steamboat's Security Interests And Liens**

73.    In the Debtor's Plan, the Debtor asserts that Steamboat's Claim "shall <u>continue</u> to be secured [by] a first lien on the <u>same collateral</u> as existed on the petition date." *See* Debtor's Second Amended Plan of Reorganization, Section 4.1, p. 9. (emphasis added).  However, the Proposed Deed of Trust does not grant Steamboat the same security interests and liens on the same collateral that it had pre-petition.[20]

74.    For example, under the Existing Deed of Trust, Steamboat currently holds a security interest or lien in the following collateral: (1) existing or future improvements, (2) current and future appurtenances, (3) any equipment or personal property in which the Debtor has a possessory or title interest, (4) inventory that is owned or will be acquired, (5) accounts, documents and other general intangibles and contracts, permits, licenses, plans and specifications and other intangibles, (6) leases, (7) other income, proceeds, judgments, claims, awards for damages and settlements relating to the property described in (3), (4) or (5).

75.    In the Plan, the Debtor proposes to take away almost all of this security and only give Steamboat a lien on certain real property (not including improvements or appurtenances) and certain rents, income and receipts from the property. Proposed Deed of Trust at ¶D7. However, the Debtor's projections plainly contemplate that the Debtor will take cash proceeds from the operation of Steamboat's collateral and use that cash to pay other creditors under the Plan.  For example, the Project Ownership Entity intends to develop condominiums at Raveneaux with future plans for residential or commercial development.  The Pro Forma Financial Statements attached as Exhibit 7.1 to the Disclosure Statement show that the Debtor

---

[20] For the purpose of this Objection, the term "**Proposed Collateral**" means that collateral described under the Proposed Deed of Trust and "**Existing Collateral**" means that collateral described under the Existing Loan Documents.

relies on the future revenue from this proposed development to fund payments under the Plan. The proceeds generated from Steamboat's Existing Collateral, including the hoped-for rental revenue, are part of Steamboat's Existing Collateral and cannot be used to pay other creditors. *See In re Miami Ctr. Assoc., Ltd.*, 144 B.R. 937, 941 (S.D. Fla. 1992); *In re Vernon McCarty*, 69 B.R. 377, 377-78 (Bankr. M.D. Fla. 1987). This should also be true under the Proposed Deed of Trust, but Debtor's Plan ignores this obligation, proposing to *de facto* take away this lien right.

76.     The Proposed Deed of Trust also improperly proposes the release of Steamboat's existing liens on machinery and equipment. In the case of *CoreStates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 46 (E.D. Pa. 1996), the debtor proposed to allow the secured creditor to retain its lien as to the Debtor's real property, but proposed that Corestates' existing equipment liens be removed. The court held that "the Plan fail[ed] to satisfy § 1129(b)(2)(A)(i)(I) because it release[d], without authorization or negotiation, CoreStates' machinery and equipment liens arising out of the cross collateralization." *Id.*; *see also In re Kain*, 86 B.R. 506, 520 (Bankr. W.D. Mich. 1988) (denying confirmation of a plan that did not allow creditor to "retain its lien" on its prepetition collateral); *In re L.B.G. Props., Inc.*, 72 B.R. 65, 66 (Bankr. S.D. Fla. 1987) (denying confirmation of a plan that did not allow secured real estate lender to "retain its lien").

77.     The Debtor's proposed release of Steamboat's existing liens on the Existing Collateral is improper and confirmation should be denied.

### ii.     The Proposed Loan Documents Omit Material Covenants

78.     The Existing Deed of Trust and Loan Agreement contain many material covenants, which are <u>not included</u> in the Proposed Loan Documents. The elimination of such material covenants is not "fair and equitable" to Steamboat. A list of these omitted covenants is

attached as **Exhibit B**.  The Debtor proposes to eliminate, among others, covenants <u>not</u> to: change the use of the Premises (Section 2.3); take any steps whatsoever to convert the Premises to a condominium or a cooperate form of ownership (Section 2.3); cause, suffer or permit the construction of any material buildings, structures or improvements on the Premises (Section 4.5); or entering into any transaction of merger or consolidation (Section 2.10).  These covenants are a <u>material</u> part of Steamboat's Existing Loan Documents effectively permitting Steamboat to declare a default and force itself to be refinanced out (or foreclose) if the Debtor wishes to change the basic use of Steamboat's collateral.

79.     In the case of *In re P.J. Keating Co.*, 168 B.R. 464, 472-73 (Bankr. D. Mass. 1994), the court denied confirmation of a plan because a significant covenant in the secured creditor's loan documents prohibiting stock redemption was to be eliminated, explaining that:

> Elimination of this [covenant] would require Fleet to sit back and do nothing as most of the $5.5 million redemption price, plus interest, is paid out without the Debtor receiving value in return and while a large balance is still due on Fleet's loan.  That is hardly fair and equitable.  The Debtor's elimination of this covenant is sufficient alone to prevent confirmation.

*Id*. at 473.

### iii.     The Debtor's Proposed Representations And Warranties Differ In Material Respects From The Existing Loan Documents

80.     The Project Ownership Entity's representations and warranties to Steamboat regarding the Proposed Collateral in the Proposed Deed of Trust differ in several material respects from the representations and warranties Raveneaux made in the Existing Deed of Trust with respect to the Existing Collateral.  For example, under the Proposed Deed of Trust, the Project Ownership Entity's <u>title representation</u> is <u>subject to</u> "easements, rights of way and prescriptive rights, whether of record or not and all presently recorded instruments that affect the

property." *See* Terms of Proposed Deed of Trust.   By contrast, under the Existing Deed of Trust, Raveneaux's title representation with respect to that portion of the Existing Collateral consisting of real property (the "Premises") is limited <u>only</u> to those items specifically described on Exhibit B to the Loan Agreement, and its title representation with respect to that portion of the Existing Collateral consisting of personal property is free from any limitation.[21]   *See* § 2.9 of the Loan Agreement and §3.1(b).

81.   Furthermore, in the Proposed Deed of Trust, the Project Ownership Entity makes no other representation or warranty to Steamboat regarding the Proposed Collateral.  In contrast, in the Existing Loan Documents, Raveneaux makes a broad array of representations and warranties concerning Steamboat's Existing Collateral, including those regarding the environmental and physical condition of such collateral, the operation and use of same with respect to compliance with (1) environmental and other law, (2) zoning restrictions, and (3) the terms and conditions of any permit, agreement of easement relating to such collateral. *See* § 2.10 and Art. 2 of the Loan Agreement.

82.   In the case of *In re Nolen Tool Co.*, 50 B.R. 488, 490 (Bankr. W.D. Ark. 1985), the court denied confirmation of a Chapter 11 debtor's plan based on the debtor's failure to give the secured creditor substantially similar rights to those contained in its original loan agreement. The Court explained:

> 'Fair and equitable' does not contemplate the restructuring of City National Bank's debt under Chapter 11 over a ten year period against its objection without requiring the debtor to <u>provide rights substantially similar to the rights in the prepetition loan agreement that are commercially reasonable under the circumstances</u>.

---

[21]In fact, Raveneaux represents that such personal property is free from any lien, security interest, encumbrance or adverse claim of any kind under Section 3.1(b) of the Existing Deed of Trust.

*Id.* (emphasis added).   Because the Debtor's Plan does not propose to give Steamboat substantially similar rights to those provided in the Existing Loan Documents, the Plan is not "fair and equitable" with respect to Steamboat.

### iv.   The Proposed Loan Documents Materially Alter What Constitutes An Event Of Default

83.     The events of default set forth in the Proposed Deed of Trust also differ in material respects from the events of default in the Existing Loan Documents.   For example, the Existing Loan Documents provide that if any representation of Raveneaux set forth in any of the Existing Loan Documents was untrue in any respect, or if an event of default occurred with respect to Raveneaux under any of the Existing Loan Documents or under other deed of trust, mortgage or security agreement encumbering all or any part of the Existing Collateral, then an event of default will occur under the Existing Deed of Trust.   (*See* §4.1(d), (f) & (g)).   The Proposed Deed of Trust does not provide for any of these standard events of default.

84.     Further, the Proposed Deed of Trust gives the Project Ownership Entity ten (10) days after receiving notice from Steamboat to cure any failure to make a payment under the Proposed Note.   (*See* §B.6 of the Proposed Deed of Trust).   The Existing Deed of Trust provides Raveneaux five (5) days to cure such failure.   (*See* §4.1(a)).   Such an attempt to double the cure period and eliminate the requirement that the statements contained in the documents (which the lender is relying on) are true is a material change to Steamboat's Existing Loan Documents and should not be allowed.

### v.   The Proposed Deed Of Trust Strips Steamboat Of Rights And Remedies

85.     Lastly, the Proposed Deed of Trust fails to include rights and remedies available under the Existing Loan Documents.   A list of some of these omitted rights and remedies is

attached as **Exhibit C**.   Taking away all of these significant, material, bargained-for requirements is not fair and equitable with respect to Steamboat.

86.     Most significant is the Debtor's attempt to take away Steamboat's right to foreclose based upon the events of default set forth in the Existing Loan Documents.  In the case of *In re D & F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989), the Fifth Circuit ruled that a debtor's plan was not fair and equitable where, as here, it attempted to bar the creditor's foreclosure rights.  The Court explained:

> [The creditor] did not lend its credit to this project on the strength of Cimarron's fiscal integrity nor that of the debtor.  It furnished the funds that paid for constructing the apartments on the basis that it be given a right under Texas law to recover its funds from the land and improvements if they could not be repaid as promised.

*Id.* at 675-76.

87.     The Existing Loan Documents which Steamboat have been in place since 1997, over 8 years ago.  Steamboat's rights and remedies under the Existing Loan Documents are perhaps the most significant and material bargained-for rights and the Court should not allow the Debtor to strip them away.

### vi.     The Plan May Not Give Steamboat Any Personal Guaranty Of Payment

88.     The Existing Loan Documents included a Guaranty from the principals of the Debtor.  The Proposed Loan Documents give Steamboat no such additional collateral.  The Debtor's Plan does not propose that the Proposed Note be secured by any personal guaranties and it might, as discussed above, be proposing a release arguably broad enough to include the Debtor's partners.

89.     At a minimum, the Plan should not affect Steamboat's rights to enforce the Guaranty against Kindred and Kirkham.  Bankruptcy Courts have held that where a plan requires

that a creditor extinguish all third party guarantees presently securing a note, the terms of the original loan agreement has been substantially changed and the plan abrogates the standard under Section 1129(a)(1) by violating the provisions of Section 524(e). *See In re Eller Bros., Inc.*, 53 B.R. 10, 12 (Bankr. M.D. Tenn. 1985).

> **b.**    **The Plan Proposes To Pay Steamboat An Unreasonably Low Interest Rate**

90.    The proposed 7.5% interest rate on Steamboat's replacement note under the Plan, is not fair and equitable in that it does not yield to Steamboat the present value (or the indubitable equivalent) of its secured claim.[22]  In fact, Steamboat's stream of monthly payments under the current Plan would be significantly <u>lower</u> than the payments required under the Existing Loan Documents.  At the end of seven years, under Debtor's Plan, it would have only paid Steamboat less than $1 million and still owe Steamboat over $8.2 million in principal, which is <u>more principal</u> than it owed Steamboat as of the Petition Date.

91.    The terms of the proposed loan (to be forced on Steamboat), including its proposed 30-year amortization and absence of substantial covenants and collateral, are not standard and not available in the marketplace. *In re Pelham Street Assoc.*, 134 B.R. 700, 701 (Bankr. D. R.I. 1991) (stating that "[a]mortizing the bank debt at a <u>below-market interest payment rate over a twenty-five year period</u>, with the <u>promise of a balloon payment at the end of five years</u>, <u>does not even begin to meet the 'fair and equitable' treatment test</u> pursuant to § 1129(b)"); *In re Arnold*, 80 B.R. 806, 813 (Bankr. M.D. La. 1987) (holding that a Chapter 11 plan which proposed stream of payments over 20 years at a 9% interest rate, which was 3 to 5%

---

[22] *In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 45 (Bankr. D. Del. 1991) (finding that a Chapter 11 debtor's treatment of a secured creditor through deferred cash payment amortized over a 30-year term at 10% interest was not fair and equitable because a 30-year term was unreasonably long as very few bank loans were being made to hotel/motel ventures such as debtors and such loans were typically several years long with 10 or 15 years being longest possible commercially available);

below market rate for loans of type provided in plan for non-accepting creditors, did not meet the requirements of 11 U.S.C. § 1129(b)(2)(A)).

92.     The proposed interest rate for this proposed high-risk loan is less than Debtor could obtain in the marketplace.  *See In re Edgewater Motel, Inc.*, 85 B.R. 989, 997 (Bankr. E.D. Tenn. 1988) (stating that "if the Plan proposes to pay interest on the fully secured claim of Union Planters at a rate less than the current market rate, the Plan does not satisfy the 'fair and equitable' requirement of § 1129(b)(2)(A)(i)") (citing *In re Sullivan*, 26 B.R. 677, 680 (Bankr. W.D. N.Y. 1982) (debtor's 9½% interest rate on mortgage balance did not satisfy the "fair and equitable" requirement in a market where the prime rate of interest was in excess of 16%)).

93.     No market lender would make a loan to the Debtor at a rate so close to the prime rate due to its poor loan document compliance and financial performance in the past few years, and its speculative projections for the future.[23]   As explained above, the Plan is entirely speculative and the Debtor is not likely to meet its financial projections.  The Debtor's past financial trends have worsened year by year and there is no proposal to change the Debtor's existing management.  Steamboat is at substantial risk that it will not receive payments under the Plan, yet the Debtor proposes to give Steamboat less collateral and fewer rights under the Proposed Loan Documents than Steamboat currently has.  The proposed interest rate does not provide adequate compensation to Steamboat for the business risk and poor legal terms of the loan that the Debtor proposes to force on Steamboat under the Plan.

94.     The general rule for plan interest rates is that they must compensate for the risk of the particular post-confirmation credit at issue.  The Supreme Court in *Till v. SCS Credit Corp.*,

---

[23]6.5% is the current Prime Rate of interest, a rate reserved for lender's most credit worthy customers.  Considering the Debtor's well documented history of defaults (including the multiple defaults under the Rule 11 Agreements), literally beginning with the month after the original loan was funded in 1997, the Debtor, and its General Partner,  fall far from the category of "most credit worthy".

541 U.S. 465 (2004) applying a "formula approach" to determine the proper cramdown rate of interest recently stated that:

> The approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a <u>creditworthy commercial borrower</u> to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default...The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Id.* at 478-79 (emphasis added);  *See In re 222 Liberty Assocs.*, 108 B.R. 971, 994 (Bankr. E.D. Pa. 1990) (noting that "deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, durations, collateral and risks") (quoting 5 COLLIER, ¶ 1129.03[4][i], at 1129-62); *In re Bryson Props., XVIII,* 961 F.2d 496, 500 (4th Cir. 1992) (same); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 658 (Bankr. D. N.J. 1980) (stating that "[i]t appears clear to the Court that the forced loan proposed by the debtor includes terms less favorable to City than would typically be found in the market and that any confirmable plan must compensate City for this deficiency").[24]

95.     A loan with such a non-standard, non- market available 30-year amortization term as that sought to be imposed on Steamboat under the Plan requires interest rate compensation.  A loan with such non-standard, non-market available loan documents, rights, warranties and covenants requires additional interest rate compensation.  *In re Lewis Indus.*, 75 B.R. 862, 868-

---

[24]*See also In re Immenhausen Corp.*, 172 B.R. 343, 348-49 (Bankr. M.D. Fla. 1994) (The court found that the debtor's Chapter 11 plan could not be confirmed because: (1) after paying administrative and unsecured claims pursuant to terms of plan, the debtor would have $365,734.20 in cash flow to service payment on mortgagee's $11 million claim which would only be sufficient to make interest-only payments to mortgagee at 3.32 percent with no amortization of principal; (2) if the debtor was required to pay the mortgagee the current market rate of interest at a minimum of 9 ½% with 15-year amortization, the debtor would have a negative cash flow; (3) although debtor planned to refinance or sell property at the end of the 5-year proposed life of the plan, no institutional lender would have granted the debtor a loan under the terms proposed by the debtor or could have survived with the forced loan under these terms; and (4) debtor would not have funds post-confirmation to meet its obligations.).

70 (Bankr. D. Mont. 1987) (acknowledging that "the appropriate discount or interest rate is to be fixed by considering the 'prevailing market rate for a loan of a term equal to the payment period, with due consideration of the quality of the security and risk of subsequent default'" and holding that "the 12 year Plan at 9% interest does not provide Eastside with the indubitable equivalence of its bargain, both as to present value and insuring the safety of the principal") (citations omitted); *In re D&F Constr. Inc.*, 865 F.2d 673, 675-76 (5th Cir. 1989) (Even assuming that the debtor's Chapter 11 plan met the requirements set forth in Section 1129(b)(2), it was not fair and equitable to the lender since the lender could not exercise its foreclosure rights under the plan and the plan provided for 12 years of negative amortization coupled with deferring substantially all repayment of principal for 15 years.)

96.     Because the involuntary loan, which Debtor's Plan proposes to force on Steamboat, would extend an already matured loan for seven years based on a 30-year amortization schedule, with a below market interest rate containing an insufficient risk premium, and because the Plan strips away Steamboats existing liens securing its claim, all without adequate compensation, the Plan is not fair and equitable under 11 U.S.C. §1129(b)(2)(A)(i).

### c.     Debtor's Plan Does Not Provide Steamboat With The Indubitable Equivalent Of Its Claim

97.     Even though the requirements of 11 U.S.C. § 1129(b)(2)(A)(i) are not met, a plan may be confirmed against a dissenting class of secured claims if the plan or order of confirmation provides for the realization by such holders of the "indubitable equivalent" of such claims.  11 U.S.C. § 1129(b)(2)(A)(iii).  As indicated in the legislative history of that section of the Code, the indubitable equivalent language is intended to follow the strict approach taken by Judge Learned Hand in *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir. 1935).  *See* S.

Rept. No. 95-989 to accompany S. 2266, 95th Cong., 2d Sess. (1978) pp. 126-129.  In *Murel*,

Judge Hand stated:

> It is plain that 'adequate protection' must be completely
> compensatory; and that payment ten years hence is not generally
> the equivalent of payment now.  <u>Interest is indeed the common
> measure of the difference, but a creditor who fears the safety of his
> principal will scarcely be content with that; he wishes to get his
> money or at least the property.</u>  We see no reason to suppose that
> the statute was intended to deprive him of that in the interest of
> junior holders, <u>unless by a substitute of the most indubitable
> equivalence.</u>

*In re Murel Holding Corp.*, 75 F.2d at 942 (emphasis added).

98.     Accordingly, a determination of the indubitable equivalence of a debt instrument

would in most circumstances be by reference to its present money value.  S. Rept. No. 95-989 to

accompany S. 2266, 95th Cong., 2d Sess. (1978) pp. 126-129.[25]  Other courts, in determining

indubitable equivalence, have considered: (1) whether the substitute compensates for present

value; and (2) whether the substitute insures the safety of the principal.  *See In re Monnier Bros.*,

755 F.2d 1336, 1339 (8th Cir. 1985).[26]

99.     For the reasons discussed at length above and based on the authorities cited,

Steamboat asserts that it is not receiving the present value of its claim.  *See In re Edgewater

Motel, Inc.*, 85 B.R. 989, 998-99 (Bankr. E.D. Tenn. 1988) (The court found that the debtor's

Chapter 11 plan, which provided for payment of 9% interest to fully secured creditor over 10-

---

[25] *See also Beal Bank, S.S.B. v. Way Apts. (In re Way Apts.)*, 201 B.R. 444, 454 (D. N.D. Tex. 1996) (acknowledging that the legislative history suggests that Congress intended the phrase "indubitable equivalent" to mean that the secured creditor must be compensated for present value.  In order for the creditor to receive the present value of its secured claim, the court must calculate the appropriate interest rate).

[26] *See In re Lewis Indus.*, 75 B.R. 862, 868-70 (Bankr. D. Mont. 1987) (Debtor's proposed Chapter 11 plan which would pay principal of fully secured creditor's claim in full over 12 years at 9% interest and permit creditor to retain its lien against debtor's assets during repayment period could not be confirmed, because plan failed to provide creditor with indubitable equivalent of its bargain, both as to present value and insuring safety of principal, as required under Section 1129(b) since plan failed to provide repayment of creditor's claim at prevailing market interest rate of 10 ¼% for term of 7 years for comparable loan); *In re Hoff*, 54 B.R. 746, 753-54 (Bankr. D. N.D. 1985) (Debtors' Chapter 11 plan did not comply with Section 1129(b)(2)(A)(i) because secured creditor was not retaining lien on all property securing claim and the safety of the principal collateral would not be protected by the replacement lien on crops since one crop failure would leave creditor's interest unprotected; thus, replacement lien is not indubitable equivalent.).

year period, was neither fair and equitable nor provided creditor with indubitable equivalent of its claim under Section 1129(b)(2)(A) where current market rate of interest was 12% and where confirmation of plan would have effect of converting construction loan to 12-year loan and would leave secured creditor in substantially same position at end of 10-year life of plan with claim of $ 6.9 million instead of $ 8.4 million claim which it had at beginning of plan.).

100.    Also, for the reasons discussed at length above and based on the authorities cited, the Proposed Loan Documents do not offer Steamboat a sufficient substitute to "insure the safety of the principal" since its rights under the Existing Loan Documents have been materially altered.  *See In re Nolen Tool Co.*, 50 B.R. 488, 489-90 (Bankr. W.D. Ark. 1985) (The court found that the debtor's Chapter 11 plan of reorganization would not be confirmed where plan, which provides for payment to secured creditors over period of 10 years and allows creditors to retain their liens but does not grant lien on after-acquired property, does not provide for "indubitable equivalent" of their pre-petition claims within Section 1129(b) because (1) it did not provide rights substantially similar to rights in pre-petition loan agreement and (2) creditor may become undersecured as collateral becomes obsolete or converted to a form of after-acquired property of different description which eludes their pre-petition liens.).

101.    Because the Plan does not propose to give Steamboat the indubitable equivalent of its claim, Debtor cannot meet the requirements of Section 1129(b)(2)(A)(iii).  *See In re Bernard*, 70 B.R. 181, 186 (Bankr. E. D. Ark. 1986) (holding that "[t]o constitute the indubitable equivalent of Land Bank's claim, the debtors must propose to execute a new first mortgage or deed of trust to Land Bank with substantially all of the provisions of the original prepetition mortgage or deed of trust and with a correct and specific legal description of the collateral.  In addition, the plan must also propose that the debtors execute a new note to Land Bank in the

exact amount of the remaining balance of Land Bank's debt containing <u>substantially the same</u> <u>terms and conditions as the original promissory note</u>.")

102.   In the case of *In re Miami Ctr. Assoc., Ltd.*, 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992), a Florida Bankruptcy Court held that a plan was not fair and equitable under Section 1129(b) since it provided for the debtor's partners to retain their interests in the debtor while the secured creditor, Aetna, was not being paid in present value terms, before the partners.   The Court, explained that:

> The absolute priority requirement is implicit in § 1129(b)(1) and (2), imposing a 'fair and equitable' standard on cram down plans. 'The fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders.'

*Id*. at 941-42 (quoting *In re Lakeside Global II, Ltd*, 116 B.R. 499, 511 (citing *Case v. Los Angeles Lumber Products Co*., 308 U.S. 106 (1939)).

103.   The court explained further:

> Under the absolute priority rule, when the issue is cram down under § 1129(b)(2), and where the value of the estate's sole asset is going forward in the future and there is an objecting secured lender, any plan of reorganization either must pay, in present value terms, the entire debt owed to the secured lender or it has to leave nothing with junior or residual claimants, such as equity owners, whether they be partners or shareholders.  *Lakeside Global*, 116 B.R. at 511. **Simply put, Aetna is not receiving the indubitable equivalent of the present value of its claim since it is being required to wait ten years to realize its secured claim**.  The package of rights afforded to Aetna under the Third Amended Plan does not provide Aetna with any upside potential. That upside potential is going to the equity or residual claimants. *Lakeside Global*, 116 B.R. at 514. According to the debtor's own projections, the debtor will be required to pay approximately half of Aetna's total secured claim as a balloon payment ten years in the future.  **Given the risks associated with hotel loans in general as was testified to by both experts and the fact that the expected increase in value in the hotel will be contingent upon the**

**completion of a substantial renovation project, it is questionable whether Aetna will receive the value of its total secured claim.** It is just this sort of attempted risk shifting that the absolute priority rule was intended to prevent.

*Id*. (emphasis added).

104.    Based on the foregoing, the Plan is not fair and equitable, and cannot be confirmed under Section 1129(b)(2)(A)(iii).

> **D.    The Plan Does Not Provide That Creditors Will Receive At Least As Much As They Would In A Chapter 7 Liquidations And Thus, Does Not Comply With Section 1129(a)(7)**

105.    A plan cannot be confirmed unless an impaired class of creditors has either accepted the plan or "will receive or retain under the plan on account of such claim or interest property of a value…that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7). Thus, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical Chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date.   *See* Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1129.03[7][b] (15th ed. Rev. 2005).   Accordingly, Section 1129(a)(7) "is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation."   *Id*. at ¶ 1129.03[7].   Section 1129(a)(7) restates the "best interest of creditors" test as contained in Section 366(2) of Chapter XI of the Bankruptcy Act.   *See id. at* ¶ 1129.03[7][e].

106.    The Debtor's Plan does not meet the "best interest of creditors" test for several reasons, including that: (1) the Plan does not provide Steamboat with the present value of its claim; (2) the Debtor's property, if liquidated, would satisfy the claims of all real creditors <u>now</u> so they would not be exposed to the risk of not getting paid in the future; (3) the Debtor has not

included the projected value from the recovery of potentially avoidable transfers; and (4) the Debtor's Plan has not disclosed Mr. Kindred's personal assets which are available to satisfy creditors.

### 1. The Plan Does Not Provide Steamboat With The Present Value Of Its Claim

107.    As discussed above, the Debtor's Plan proposes to extend Steamboat's fully-matured loan for an additional seven years based on a 30-year amortization schedule, but with most of the protective covenants, representations, warranties, rights and liens removed.  Based on the authorities cited above, the Debtor's Plan does not provide Steamboat with the present value of its claim since the proposed interest rate does not adequately compensate Steamboat for (1) the risk to Steamboat of non-payment in the future based on Debtor's business plan; (2) the removal of numerous material covenants that protected Steamboat's Existing Collateral; (3) the removal of numerous material warranties regarding the condition of Steamboat's Existing Collateral; (4) the removal of all the liens and security interests (other than real estate) that Steamboat has on its Existing Collateral; (5) the risk that significant parts of Steamboat's real estate collateral will be conveyed away at a bargain price and (6) the risk of decline in value of Steamboat's collateral. [27]

108.    The Debtor's proposed seven year stream of payments to Steamboat does not equal the present value of Steamboat's claim of approximately $9.1 million, particularly where the Debtor has introduced into evidence an appraisal showing that the Debtor's property is worth $12.9 million.  Given the Debtor's history of poor cash flow, the Debtor's proposal to stretch out Steamboat's Note over a seven year period, pay Steamboat less than $1 million during that time,

---

[27]  A creditor will not receive the present value equal of its claim if the Plan establishes an interest rate that is too low.  See Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1129.03[7][b][ii] (15th ed. Rev. 2005) (also acknowledging that "the present value of a note is intimately tied to its interest rate").

and end up owing Steamboat $8,245,834.00 in principal seven years hence does not allow Steamboat to realize the present value of its fully-matured $9.1 million claim.   Therefore, the Plan does not provide Steamboat with the present value of its claim as required by Section 1129(a)(7).

>    **2.    Legitimate Creditors In This Case Would Receive Payment In Full In Liquidation, Rather Than Waiting And Risking Non-Payment Of Their Claims In The Future**

109.    Based on the $12.9 million appraisal of its assets on which the Debtor has introduced into evidence, it is likely that a Chapter 7 Trustee would be able to sell the Debtor's real property now and have enough cash to pay all of the Debtor's <u>real</u> creditors in full, rather than stretching out payments to creditors over time.

110.    Specifically, in its flawed liquidation analysis, the Debtor has estimated that all creditors, except general unsecured claims, would receive 100% of their claims under the Plan. The Debtor estimates that the $2,266,091 in unsecured creditors would receive 38% in liquidation.  However, the Debtor has apparently included the insider and non-Raveneaux claims of Brittain, Mower, Von Hagge, Stubbs and Watford (discussed below) in this general unsecured class.   Of the total $2,266,091 in general unsecured claims, only approximately $515,000.00 represents "real" unsecured claims.[28]   The claims of insiders and non-Raveneaux debts should either be subordinated to holders of legitimate general unsecured claims or disallowed (as non-Raveneaux claims) in their entirety.

111.    Additionally, the Debtor's liquidation analysis assumes "wind-down costs" of $600,000.00 based on an estimate of $100,000.00 per month for 6 months for "minimal golf course maintenance costs as well as other fixed and employee costs."   Ironically, the Debtor

---

[28] However, this class also includes the $300,000 claims of Dennis Evans, also arguably an insider.

estimates spending more money performing "minimal golf course maintenance" during its wind-down period than it plans on spending pursuant to the Plan over the next several years. Steamboat believes that the amount assumed to wind-down the Debtor's business is drastically overstated.

112.   The Debtor has admitted that it has only conducted a "limited analysis" of potential recoveries under Chapter 5 of Title 11.  (*See* Debtor's Second Amended Disclosure Statement, Section 16.4.)   However, a detailed examination of the best interests test under Section 1129(a)(7) requires an examination of the potential claims against Insiders.   The adequacy of disclosure is an essential element for plan confirmation embodied in the § 1129(a)(2) confirmation requirement.  *In re Lapworth*, 1998 Bankr. LEXIS 1383, 10-11 (Bankr. Pa. 1998) (*citing In re Sierra-Cal*, 210 B.R. 168, 174 (Bankr. E.D. Cal. 1997) (where disclosure statement did not disclose potentially avoidable transfers against affiliates, information was inadequate under § 1125 and plan could not be confirmed under § 1129(a)(2)). The Debtor has failed to include in its liquidation analysis, potential recovery from the approximately $345,000 of payments made to Messrs. Kindred and Kirkham in the year before the Petition that are disclosed in its Statement of Financial Affairs.   The transfers made to these insiders are potentially avoidable by a Chapter 7 Trustee and recoveries thereon could be used to pay creditors in a liquidation.

113.   Further, Anthony Kindred, as the general partner of Raveneaux Limited, is personally liable for all of the debts of the partnership.  *See* TEX. REV. CIV. STAT. ANN. art. 6132a-1, § 4.03(b) (Vernon 2004) ("[A] general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners.").   Therefore, Mr. Kindred's personal assets must be included in the Debtor's

liquidation analysis as Mr. Kindred's personal assets are available to satisfy the claims of creditors against Raveneaux. *See MBank Corpus Christi, N.A. v. Seikel* (*In re I-37 Gulf Ltd. P'ship*), 48 B.R. 647, 650 (Bankr. S.D. Tex. 1985) (noting that it is necessary for the court to determine the net worth of each of the partners of the partnership, in order to determine whether a plan can be confirmed under Section 1129(a)(7) of the Bankruptcy Code).

114.    Under a liquidation analysis which actually follows the absolute priority scheme of the Bankruptcy Code and properly subordinates insider claims yields the following results:

| Proceeds from Liquidation | $12,967,500 | Recovery |
|---|---|---|
| Steamboat Secured Claim (Class 1A) | ($9,100,000) | 100% |
| Other Secured Creditors (Class 1B) | ($472,169) | 100% |
| SBA Secured Claim (Class 1C) | ($170,807) | 100% |
| Estimated Chapter 7 Administrative Expenses: Trustee and Receiver Fees $373,500 Counsel, Professional Fees and Wind-down costs ($300,000) | ($673,500) | 100% |
| Chapter 11 Administrative Expense and Priority Tax Claims (Class 2) | ($31,314) | 100% |
| General Unsecured Claims (Class 6A) minus Dennis Evan's claim (see below) | ($398,542.88) | 100% |
| Member Security Deposit Claims (Class 5) | ($1,693,177) | 100% |
| **Remaining Proceeds after payment of all administrative expenses, and secured priority and non-subordinated unsecured claims** | **$427,990.12** | |
| Insider Unsecured Claims: Watford $115,000 (Class 6D) Dennis Evans $205,326.02 | ($320,326.02) | 100% |
| **Remaining Proceeds before payments to non-creditors and equity** | **$107,664.10** | |
| Non-Raveneaux Claims:* Von Hagge: $396,595 (Class 6B) C.W. Stubbs $75,033 (Class 6C) | ($471,628) | 25% |
| Equity Holders (Class 7) Kate Mower (admitted by Debtor to be capital contribution) Janet Brittain (admitted by Debtor to be capital contribution) | $0 | 0% |

115.    In fact, this fair liquidation analysis shows that all of the real creditors of Raveneaux including insiders, could be paid out of the proceeds of the $12.9 million[29] liquidation sale, with $107,000 left over.  The only people who would not be paid in full under this approach are the *de facto* insiders whose claims were been purportedly assumed by Raveneaux because Tony Kindred has guaranteed them, and Brittain and Mower who the Debtor has admitted are equity claimants.  Further, the percentage paid to these claims could be increased by potential recoveries from avoidance actions against Messers. Kindred and Kirkham, and through recoveries by a Chapter 7 Trustee from Anthony Kindred's personal assets.

116.    The only parties who would fare worse in liquidation than under the Plan are the holders of Non-Raveneaux Unsecured claims and holders of Equity Interests.  All other classes of creditors would be paid now in full, in cash rather than stretching out payments over time and exposing them to risk under Debtor's speculative Plan.

117.    Based on all of the foregoing, the Debtor's Plan has not shown that creditors would receive or retain property of a value that is not less than the amount that such creditor would so receive or retain if the Debtor were liquidated under Chapter 7.  Therefore, the Plan does not satisfy the requirements of Section 1129(a)(7).

### E.    The Debtor Has Gerrymandered Classes Of Claims And, Thus, The Plan Does Not Comply With Section 1129(a)(1)

118.    Section 1129(a)(1) of the Bankruptcy Code states that the Court may confirm a plan of reorganization only if the plan "complies with the applicable provisions of [Title 11]."

---

[29] The Debtor has proposed to reduce the $12,967,500 book value of Raveneaux's property to $12,460,000 based on a sale to occur in 6 months rather than within a year.  Additionally, the Notes to the Debtor's Liquidation Analysis state that the Debtor believes that the golf course maintenance equipment will generate an additional $570,000 at auction, but proposes a 4% commission to a broker for a sale of the Debtor's property.  Steamboat believes that such a commission would not be necessary if a Chapter 7 Trustee were to propose an auction through the Bankruptcy Court.  Therefore, Steamboat believes that the $12.9 million for the real estate plus $570,000 from golf course maintenance equipment would actually increase the liquidation proceeds to over $13.4 million.  However, Steamboat has used the more conservative $12.9 million number.

Section 1129(a)(1) includes the provisions of Bankruptcy Code Sections 1122 and 1123 concerning classification.

119.    A plan may not be confirmed unless it complies with the classification standards contained in Section 1122.  *See* 11 U.S.C. §§ 1122, 1123(a)(4).  Section 1122(a) contemplates that holders of similar kinds of claims (such as unsecured claims) be classified together unless there is an adequate justification for classifying them differently.  *See In re Fantastic Homes Enters., Inc.*, 44 B.R. 999, 1000 (M.D. Fla. 1984) (reversing the order confirming the debtor's plan since there was an inadequate showing of compliance with Section 1129(a)(1) where the plan contained 4 separate classes containing unsecured claims, all claims were of similar nature and no evidence supported dissimilar treatment); *In re Austin Ocala, Ltd.*, 152 B.R. 773, 775 (Bankr. M.D. Fla. 1993) (finding error "[i]f a plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed") (internal citations omitted).  The Debtor's Plan repeatedly violates this standard.

120.    The Debtor proposes to separately classify the unsecured claims of Van Hagge (Class 6 B), C.W. Stubbs (Class 6 C) (a member of the Creditors' Committee) and Mike Watford (Class 6 D) (Chairman of the Creditors' Committee) from other general unsecured claims.  The Von Hagge and Stubbs claims <u>are not really even claims against the Debtor</u>, but are claims against Anthony Kindred's former golf course, Houston National Golf Club ("HNGC"), and Anthony Kindred personally, as guarantor of the Stubbs debt.  Raveneaux, through Anthony Kindred, purportedly "assumed" those HNGC debts for no consideration that has ever been evidenced in writing.  The Plan proposes to pay the Von Hagge and Stubbs in full over time at interest rates of 8% and 10% respectively, while other unsecured creditors are to receive only

their pro rata share of $515,000.  There is simply no basis to classify Von Hagge and Stubbs' claims separately from those of other unsecured creditors and give them interest rates <u>above</u> the current prime rate of interest, possibly paying them <u>more</u> than 100¢ on the dollar.  *See In re Caldwell*, 76 B.R. 643 (Bankr. E.D. Tenn. 1987) (denying confirmation where debtor has impermissibly segregated claims of unsecured creditors under Section 1129(a)(1) by placing unsecured credit card claims in one category and providing for full payment, and placing all other unsecured claims in second category and providing for only 22.7 percent distribution).[30]

121.   Further, Mike Watford, a former limited partner of the Debtor, whose claim apparently arises out of an alleged $100,000 loan to Raveneaux for the purchase of certain real estate in LaSalle County, Texas, is to receive a note to pay his claim in full over time with 8% interest.[31]   However, Dennis Evans (the brother of Douglas Evans, CFO of Raveneaux), also purportedly lent Raveneaux $200,000 for the purchase of the same real estate in LaSalle County, Texas, is classified as a Class 6 General Unsecured Creditor.  There is no basis to treat the Watford's and Dennis Evans' claims differently.

122.   Steamboat believes that Raveneaux has separated out these "friendly" creditors, placed them in separate classes and classified them as "impaired" in hopes of creating an impaired accepting class under 11 U.S.C. § 1129(b).  This improper under Fifth Circuit law.  *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1992) (stating that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a

---

[30] The court in *In re Fantastic Homes Enters., Inc.*, 44 B.R. 999, 1000 (M.D. Fla. 1984) stated:

> Where the differences are in the rates of interest, in the amounts, in the dates of maturity, in names of payees, the manner in which the claim arose and such other minor details, they cannot affect the 'nature', i.e., the kind of claim, otherwise a separate class would have to be provided for nearly every type of situation which would be an unthinkable calamity when the object and aim of the statute is regarded.

 (emphasis added).

[31]The $100,000 Promissory Note from the Debtor to Watford may also be a repayment of a portion of Watford's initial "capital contribution" to the Debtor since the Promissory Note was signed the day Watford resigned as a partner of the Debtor.

reorganization plan"); *California Fed. Bank, F.S.B. v. Moorpark Adventure*, 161 B.R. 254, 257 (Bankr. C.D. Cal. 1993) (holding that the debtor's plan was not confirmable under Section 1129(a) where the sole purpose and effect of the debtor's separate classification was to gerrymander classes in order to obtain acceptance of impaired class).  As Judge Steen of this Court has held, the Bankruptcy Court's task "is to ascertain the Plan proponent's motive and to determine whether that motive is permissible and is sufficient as an independent reason for the classification schedule."  *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 861 (Bankr. S.D. Tex. 2001).

123.    Steamboat asserts that the Debtor's motive is not permissible and sufficient as an independent reason for the classification schedule.

> **F.    The Plan Impermissibly Provides For Confirmation Based On The Votes Of Insiders And, Thus, Does Not Comply With Section 1129(a)(10)**

124.    Steamboat objects to confirmation of the Debtor's Plan under 11 U.S.C. § 1129(a)(10), which states that the Court may confirm a plan "[i]f a class of claims is impaired under the plan [and] at least one class of claims that is impaired under the plan has accepted the plan, <u>determined without including any acceptance of the plan by any insider</u>."  11 U.S.C. § 1129(a)(10) (emphasis added).

125.    If the Debtor's position concerning full payment to general unsecured creditors is true, then Class 6A (General Unsecured Claims) and Class 1B (Other Secured Creditors) are not impaired because they are paid in full on the later of 30 days after the Effective Date or the date such Claims become Allowed Claims.  Likewise, Class 5 Membership Deposit Claims are not impaired as they will purportedly be paid in full under the terms of their Membership Agreements unless they elect to receive 10% now.

126.    Class 3 claims, which includes claims admitted to be those of insiders, should not be counted in determining acceptance of the Debtor's Plan.  *See In re Bryson Props., XVIII*, 961 F.2d 496, 501  (4th Cir. 1992) (acknowledging that before a plan can be crammed down, at least one non-insider impaired class of claims must vote to accept it); *In re AG Consultants Grain Div.*, 77 B.R. 665, 677  (Bankr. N.D. Ind. 1987) (stating that "insider claims may be included within an impaired class, they just cannot be used to calculate a class acceptance"); *In re Pine Lake Village Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D. N.Y. 1982) (acknowledging that equity security holders cannot be considered as creditors for purpose of creating one affirmatively accepting class).

127.    The definition of insider in Section 101(31) in non-exhaustive.  *See Three Flint Hill Ltd. Pshp. v. Prudential Ins. Co.*, 213 B.R. 292, 297-98 (D. Md. 1997) (acknowledging that "because the statutory language [of Section 101(31) of the Bankruptcy Code] merely 'includes' types of persons deemed to be insiders, courts have found these categories to be nonexhaustive. 'An insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny.'") (emphasis added).

128.    As discussed above, the unsecured claims of Van Hagge (Class 6 B), C.W. Stubbs (Class 6 C) and Watford (Class 6D) are claims of Insiders by means of their relationship with the Debtor and their votes should not be counted for purposes of Section 1129(a)(10).  *See Three Flint Hill Ltd. Pshp. v. Prudential Ins. Co.*, 213 B.R. 292, 298 (D. Md. 1997) (stating that "insider status is determined by a factual inquiry into the closeness of the relationship between the parties and whether the transaction between the transferee and debtor was conducted at 'arm's length'") (emphasis added); *see also In re McIver*, 177 B.R. 366, 370 (Bankr. N.D. Fla. 1995) (stating that "personal relationships can also serve as the basis for 'insider' status").

Similarly, Dennis Evans is also an insider since he is the brother of Douglas Evan, Raveneaux's CFO.

129.    Based on the foregoing, the Debtor's Plan should not be confirmed under Section 1129(a)(10) based on the vote of Classes 3, 6B, 6C or 6D, which are all insiders.

130.    The Class 1A claim of Steamboat is a truly impaired class and it has voted to reject the Plan.

WHEREFORE, PREMISES CONSIDERED, Steamboat respectfully requests that this Court deny confirmation of Debtor's Second Amended Plan of Reorganization for the reasons set forth herein; and grant Steamboat such other and further relief as to which it may be entitled, either at law or in equity.

DATED:  August 24, 2005,
            Houston, Texas.

Respectfully Submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

  /s/  Zack A. Clement_____
Zack A. Clement
State Bar No. 04361550
Johnathan C. Bolton
State Bar No. 24025260
R. Andrew Black
State Bar No. 02375110
Jason L. Boland
State Bar No. 24040542
Fulbright Tower
1301 McKinney, Suite 4100
 Houston, Texas 77010
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

**ATTORNEYS FOR
STEAMBOAT CAPITAL II, L.L.C.**